UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------X
SPEEDFIT LLC and AUREL A. ASTILEAN,

     *Plaintiffs*,

                              **MEMORANDUM & ORDER**

   -against-                     13-CV-1276 (KAM)(AKT)

WOODWAY USA, INC.,

     *Defendant*.
---------------------------------X

**MATSUMOTO, United States District Judge:**

        Plaintiffs Speedfit LLC ("Speedfit") and Aurel A. Astilean ("Astilean") (collectively, "plaintiffs") commenced the instant action against Woodway USA, Inc. ("Woodway" or "defendant"), alleging that Woodway wrongfully infringed upon United States Patent No. 8,308,619 ("the '619 patent") and United States Patent No. 8,343,016 ("the '016 patent" and together with the '619 patent, the "patents-in-suit"), both of which are owned by Speedfit and relate to a manually-powered treadmill involving a closed-loop treadmill belt designed to maintain a concave running surface. (ECF No. 150, Supplemental Complaint ("Supp. Compl.") ¶¶ 18-21.) Before the court is Woodway's *Daubert* motion seeking to preclude the expert testimony offered by David Wanetick, plaintiffs' damages expert. (ECF No. 216, Def. Mot.) The court shall address Woodway's concurrently filed *Daubert* motion challenging plaintiffs' technical expert, James Whelan, shortly. (*See* ECF No. 211.)

**BACKGROUND**

Plaintiff Speedfit, founded by plaintiff Astilean and co-inventor Dan Bostan, who is not joined in this action, is a New York-based company that develops fitness programs and equipment. (Supp. Compl. ¶¶ 8-9.) Defendant Woodway is a Wisconsin-based corporation that designs, manufactures, and sells fitness and exercise products, including manually-operated treadmills with a curved running surface. (*Id.* ¶ 10.)

Familiarity with the factual and procedural history of this matter is assumed, as set forth comprehensively in this court's prior orders concerning this litigation. *See Speedfit LLC, et. al. v. Woodway USA, Inc.*, 53 F. Supp. 3d 561 (E.D.N.Y. 2014) (denying Woodway's motion to dismiss and motion to transfer); *Speedfit LLC, et. al. v. Woodway USA, Inc.*, No. 13-CV-1276, 2015 WL 6143697 (E.D.N.Y. Oct. 19, 2015) (granting leave to file a Third Amended Complaint); *Speedfit LLC, et. al. v. Woodway USA, Inc.*, 226 F. Supp. 3d 149 (E.D.N.Y. 2016) (granting in part and denying in part Woodway's motion to dismiss Third Amended Complaint); *Speedfit LLC, et. al. v. Woodway USA, Inc.*, No. 13-CV-1276, 2017 WL 5633113 (E.D.N.Y. Nov. 20, 2017) (construing claim term "means for slackening"). After claim construction, the parties requested the court schedule briefing for dispositive motions and *Daubert* motions. (*See* ECF No. 195.) The court issued a scheduling order for

briefing defendant's *Daubert* motions, anticipating it would consider dispositive motions after resolving expert evidentiary issues.  (*See* Scheduling Order dated June 17, 2018.)

Defendant moves against Wanetick's opinions as disclosed in his report dated July 27, 2015 (the "Report").  The Report begins with what appears to be a two-page cover letter addressed to plaintiffs' counsel broadly describing the parties' dispute but also tangential matters (*e.g.* a legal dispute between Astilean and a celebrity; Astilean's credit card debt).  (*See* ECF No. 218-1, Ex. 1, Wanetick Report ("Rept.") at 1-2.)  The Report identifies three relevant periods for its purposes: a period beginning with Woodway's alleged breach of a contract with Speedfit and Astilean and ending with the November 13, 2012 issuing of the '619 patent; a period beginning with the '619 patent's issue and ending December 31, 2014, the last reported day of Woodway's sales information available to Wanetick at the time he prepared the Report; and finally, a forward-looking period from January 1, 2015 through the expiration of the '016 patent, April 6, 2031.[1]  (*Id.* at 3.)  The Report sets out an opinion of damages sustained by plaintiffs from Woodway's

---

[1]     These dates appear to be of little significance to a damages calculation in light of the court's ruling, issued subsequent to the Report's preparation, that plaintiffs lack standing to sue for infringement prior to June 1, 2015. *See Speedfit*, 226 F. Supp. 3d at 157.  That fact, however, does not bear on the reliability of Wanetick's opinion and the court's decision on the instant motion.

alleged infringement of the patents-in-suit over the three time
periods, the first of which also includes damages attributable
to plaintiffs' state law claims.  For the first period, Wanetick
appears to calculate breach of contract, conversion,
constructive trust, and unjust enrichment damages but did not
actually articulate a theory of such damages.  (*See* Rept. at 3,
¶ 1, n.1; *id.* at 6, Collective Damages Analysis; *see also* ECF
No. 203, Def. Mot. to Strike, Ex. A at 1.)  For both the first
and second period, Wanetick appears to calculate patent
infringement damages based upon a reasonable royalty.
Wanetick's analysis appears in a chart titled Collective Damages
Analysis, (Rept. at 6), which relies in part on Woodway's sales
figures also disclosed in the Report, (*see id.* at 19, Ex. A).

     Wanetick concludes that "Speedfit is owed $2.3
million through December 31, 2014" and indicates further damages
will need to be calculated once Woodway discloses updated sales
figures.[2]  (*Id.*)  He selects a royalty rate of "8% of gross
sales" and opines that a 15% interest rate is appropriate.
(*Id.*)  Wanetick then calculates an implied "upfront payment"
that "would have been reasonable for Woodway to pay to

---

[2]    Counsel for Woodway has represented that plaintiffs served upon them,
after service of Woodway's opening brief in this motion, a supplemental
expert report prepared by Wanetick.  (*See* ECF No. 203.)  Defendant
subsequently moved to strike this supplemental report, which motion was
granted in part and denied in part by Magistrate Judge Tomlinson.  (*See* ECF
No. 239.)

[Astilean]" around the time the parties began their work together.  (*Id.* at 4.)  He supports the sum of $275,000 for this upfront payment by referencing Woodway's claim that it invested $150,000 in improving Speedfit's treadmill, and calculating the yield on this investment assuming an 18% rate of return from the time of the payment, March 18, 2009, until the first patent-in-suit issued, on November 13, 2012.  (*Id.*)  Wanetick selected this rate of return from a 2015 Pepperdine Private Capital Markets Report, based on his assumption that Woodway was similar to a venture capital firm and would view Speedfit as a "later-stage" investment opportunity.  (*Id.*)

In the Collective Damages Analysis chart, which covers the first two time periods from March 18, 2009 to November 13, 2012 and from November 13, 2012 until December 31, 2014 ("the last date for which [he] received sales data from Woodway"), Wanetick calculates the yearly royalty owed by Woodway by applying his selected royalty rate of 8% to Woodway's "Infringing Sales" for the years 2009 through 2014.[3]  (*Id.* at 6.) The Collective Damages includes breach of contract, constructive trust, and unjust enrichment damages for the first period.  He then sums these yearly figures and applies a 15% interest rate, adds the implied upfront payment, also accounting for interest,

---

[3]    The Report is not clear as to whether the first period or second period is inclusive of November 13, 2012.

and arrives at a rounded damages figure of $2.3 million. (*Id.*) Wanetick does not identify what portion of the damages either patent accounts for, and does not identify what he considered to be infringing sales by Woodway.

The Report's next twelve pages cover Wanetick's royalty rate calculation. He briefly describes eight licensing proposals between Speedfit and others, and then conducts a *Georgia-Pacific* analysis, laying out and applying the 15 factors articulated in the seminal patent damages case, *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970). (Rept. at 7-12.) The Report also includes a purported licensing agreement between Nautilus, Inc., a fitness industry comparator, and MedFit Systems, Inc. (*Id.* at 22-34.)

Wanetick then describes three additional methods he used to calculate a royalty rate: the University of Ghent method; the Kammerer and Lu method; and the Black-Scholes method. (*Id.* at 13-15.) The Report summarizes the results of these royalty rate calculations in a chart on page seven and highlights Wanetick's *Georgia-Pacific* factors calculation and the resulting 8% royalty rate in bold-face type. (*Id.* at 7.)

Appendix C to the Report lists the sources Wanetick consulted and relied on in formulating his damages opinion. (*Id.* at 40.) Among these sources are a general reference to "telephonic interviews" with plaintiffs' counsel, "internet

searchers (sic)," information deposited on a discovery database, a visit to a Princeton, New Jersey gym, and course materials from a Certified Patent Valuation Analyst training program which Wanetick created and administers. (*Id.; see also* ECF No. 210-1, Pl. Opp. at 9.) Missing from this list, according to Wanetick, is an emailed spreadsheet that included the necessary sales figures supporting some of his calculations, along with some legal documents like deposition transcripts and motion papers. (ECF No. 219-2, Ex. B, Wanetick Dep. at 47:5-20.) Wanetick admitted during his deposition that he did not believe every document he reviewed was worthy of being cited in the Report, and that, given significant time pressure to complete the Report, he "[could not] make notes of every single thing that [he] read."[4] (*Id.* at 49: 16-25.)

The remainder of the Report includes exhibits and appendices that describe Woodway's profit margins, the advantages and disadvantages of motorless treadmills, Wanetick's assumptions and limiting conditions for preparing the Report, along with other information concerning Wanetick's qualifications (*e.g.* his Curriculum Vitae). (*Id.* at 19-21, 35-44.)

## LEGAL STANDARD

---

[4]     Wanetick testified during his deposition that he had approximately 30 hours to complete the Report and was given approximately 12 days' notice before the Report was due. (*See* Wanetick Dep. at 47:15; 124:20-23.)

## I.   Expert Testimony

### A.   Applicable Authority

In this patent case the court applies the law of the
Federal Circuit to patent issues, and the law of its regional
circuit, the Second Circuit, to non-patent and evidentiary
issues. *In re Cambridge Biotech Corp.*, 186 F.3d 1356, 1368
(Fed. Cir. 1999); *see also Coconut Grove Pads, Inc. v. Mich &
Mich TGR, Inc.*, 222 F. Supp. 3d 222, 250 n.6 (E.D.N.Y. 2016).
Thus, questions pertaining to Wanetick's damages calculation
regarding patent infringement are governed by Federal Circuit
authority, and questions pertaining to the admissibility of
expert witness testimony offered under Federal Rule of Evidence
702 ("FRE 702"), or an expert witness's required disclosures
under Federal Rule of Civil Procedure 26 ("Rule 26"), are
governed by Second Circuit authority.

### B.   Federal Rule of Civil Procedure 26

Before reaching the merits of defendant's *Daubert*
challenge, the court will first address plaintiffs' compliance
with Rule 26.  Rule 26(a)(2)(B) requires parties provide a
report for each retained expert witness that discloses:

> (i)    a complete statement of all opinions the witness
> will express and the basis and reasons for them;
>
> (ii)   the facts or data considered by the witness in
> forming them;

     (iii)    any exhibits that will be used to summarize or
               support them;

     (iv)     the witness's qualifications, including a list
               of all publications authored in the previous 10
               years;

     (v)      a list of all other cases in which, during the
               previous 4 years, the witness testified as an
               expert at trial or by deposition; and

     (vi)     a statement of the compensation to be paid for
               the study and testimony in the case.

Fed. R. Civ. P. 26(a)(2)(B). Rule 26 "guards against the presentation of sketchy and vague expert reports that provide little guidance to the opposing party as to an expert's testimony." *Conte v. Newsday, Inc.*, No. 06-CV-4859, 2011 WL 2671216, at *4 (E.D.N.Y. July 7, 2011).

This disclosure requirement is designed to prevent a party from raising unexpected or new evidence at trial. *Id.*; *Harkabi v. SanDisk Corp.*, No. 08-CV-8203, 2012 WL 2574717, at *3 (S.D.N.Y. June 20, 2012) ("The purpose of the expert disclosure rules is to avoid surprise or trial by ambush." (internal quotation marks omitted)); *Ebewo v. Martinez*, 309 F. Supp. 2d 600, 607 (S.D.N.Y. 2004). Pursuant to Federal Rule of Civil Procedure 37, the court may preclude a party from using information or an expert witness if the relevant disclosures "are insufficiently detailed and complete to satisfy Rule 26(a)(2)." *Conte*, 2011 WL 2671216, at *4; *see also Ebewo*, 309 F. Supp. 2d at 606-07.

Defendant argues that Wanetick's Report does not comply with the Federal Rules because it does not include a statement of his compensation and is not signed by Wanetick. (Def. Mot. at 29.) The court notes that in addition to these defects, the Report apparently does not include a statement of Wanetick's litigation experience, *i.e.* cases in which he has been called to testify as a damages expert.[5] However, the court has not found a case in this Circuit in which an expert's report was precluded for failure to comply with these particular requirements of Rule 26, and defendant does not cite to any support. Given that the purpose of Rule 26 disclosures is to put the other party on notice, well in advance of trial, the court finds that the Report satisfies that purpose and does not warrant preclusion of expert testimony for the technical deficiencies defendant identified.

Rule 26(a)(2)(B)(ii) requires that a retained expert's report include "the facts or data considered by the witness in forming them." In his Report, Wanetick notes that he considered the documents exchanged in discovery, including emails between the parties, sales data from Woodway, research papers, media reports regarding non-motorized treadmills, different

---

[5]  Wanetick testified during his deposition that he had not been deposed previously as a damages expert, and that he had been previously retained as a patent damages expert but had not previously prepared a patent damages report. (Wanetick Dep. at 28:7-12; 178:13-15.)

methodologies for royalty rate calculations, comparator data regarding operating profit ratios, data regarding stock market volatility, differences between non-motorized and motorized treadmills, and comparator licensing agreements. (*See generally* Wanetick Dep.; Rept. at 40, App. C.)

In addition to the documents mentioned in the body of Wanetick's Report, the Report includes Appendix C which lists additional sources. (*See* Rept. at 40, App. C.) Although comparing Appendix C to Wanetick's deposition testimony indicates that Appendix C may be incomplete, (*see* Wanetick Dep. at 49:24-25; 61:8-11; 66:8-15), item 2 of the Appendix states that Wanetick referred to documents in a "VDiscovery" database, and the body of the Report includes citations to what appear to be Bates numbers, (Rept. at 2 n.3; 40). Thus, it is clear Wanetick at least considered the documents in the VDiscovery database. The court finds that defendant was on adequate notice as to "the facts or data considered by" Wanetick in forming his opinions, as required by Rule 26. Wanetick's deposition testimony minimally supplemented his sources, indicating that he based some of his opinions on his own research and site visits, and on facts or data available on the internet, though he did not ultimately provide a source or independently verify the information contained in some of the internet sources. (*See, e.g.*, Wanetick Dep. at 59:16-18; 66:2-15.)

Although the court may exclude an expert's testimony
if the expert's report fails to comport with Rule 26, the court
finds that the Report is sufficiently detailed to advise
defendant of the required information under Rule 26.
Plaintiffs, however, are ordered to cure the technical
deficiencies identified in the Report, namely the lack of
signature and a statement of Wanetick's compensation, and serve
an amended Report on defendant and the court no later than April
12, 2019.  Defendant shall not take this simple amendment as an
opportunity to further depose Wanetick.  The court next
addresses whether plaintiffs' expert should be precluded from
testifying for the reasons proffered by defendant.

### C.    Federal Rule of Evidence 702

FRE 702 governs the admissibility of expert testimony.
Fed. R. Evid. 702.  Whereas Federal Rule of Civil Procedure
26(a) guards against the presentation of expert reports that
provide little guidance to the opposing party as to an expert's
testimony, FRE 702 guards against the presentation of
insufficiently reliable evidence to the finder of fact.  *Conte*,
2011 WL 2671216, at *4.  FRE 702 permits expert testimony where:

> (a)    the expert's scientific, technical, or other
>        specialized knowledge will help the trier of fact
>        to understand the evidence or to determine a fact
>        in issue;

> (b)    the testimony is based on sufficient facts or
>        data;

      (c)      the testimony is the product of reliable
                 principles and methods; and

      (d)      the expert has reliably applied the principles
                 and methods to the facts of the case.

Fed. R. Evid. 702.

District courts serve as the "gatekeeper" to ensure
that, in accordance with FRE 702, an "expert's testimony both
rests on a reliable foundation and is relevant to the task at
hand." *United States v. Williams*, 506 F.3d 151, 160 (2d Cir.
2007) (quoting *Daubert v. Merrell Dow Pharm.*, 509 U.S. 579, 597
(1993)). "The district court has broad discretion to carry out
this gatekeeping function." *In re Pfizer Inc. Sec. Litig.*, 819
F.3d 642, 658 (2d Cir. 2016). The district court must "make
certain that an expert, whether basing testimony upon
professional studies or personal experience, employs in the
courtroom the same level of intellectual rigor that
characterizes the practice of an expert in the relevant field."
*Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999). The
proponent of the expert testimony has the burden of establishing
the admissibility of the evidence under *Daubert*. *In re Pfizer*,
819 F.3d at 658.

District courts also must ensure that "any and all
scientific testimony or evidence admitted is not only relevant,
but reliable." *Nimely v. City of New York*, 414 F.3d 381, 396
(2d Cir. 2005) (quoting *Daubert*, 509 U.S. at 589). Before

admitting expert testimony under FRE 702 and *Daubert*, the
district court should make the following determinations: (1)
"whether the witness is qualified to be an expert;" (2) "whether
the opinion is based upon reliable data and methodology;" and
(3) "whether the expert's testimony on a particular issue will
assist the trier of fact." *Marini v. Adamo*, 995 F. Supp. 2d
155, 179 (E.D.N.Y. 2014) (citing *Nimely*, 414 F.3d at 396-97).

To be reliable, FRE 702 "requires a sufficiently
rigorous analytical connection between th[e] methodology and the
expert's conclusions." *Nimely*, 414 F.3d at 396. "[T]oo great
an analytical gap between the data and the opinion proffered,"
warrants exclusion. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146
(1997). Thus, an expert opinion that "is based on data, a
methodology, or studies that are simply inadequate to support
the conclusions reached" is unreliable and should be excluded.
*Nimely*, 414 F.3d at 396-97 (citing *Amorgianos v. Nat'l R.R.
Passenger Corp.*, 303 F.3d 256, 266 (2d Cir. 2002)); *see also
Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir.
1996) ("[E]xpert testimony should be excluded if it is
speculative or conjectural."); *Uniloc USA, Inc. v. Microsoft
Corp.*, 632 F.3d 1292, 1315 (Fed. Cir. 2011) ("If the patentee
fails to tie the theory to the facts of the case, the [expert]
testimony must be excluded."). Accordingly, conclusory opinions
often provide an insufficient basis upon which to assess

reliability. *Estate of Jaquez v. City of New York*, 104 F. Supp.
3d 414, 426 (S.D.N.Y. 2015) (citing *Nimely*, 414 F.3d at 396);
*see also Gen. Elec.*, 522 U.S. at 146 ("[N]othing in either
*Daubert* or the Federal Rules of Evidence requires a district
court to admit opinion evidence that is connected to existing
data only by the *ipse dixit* of the expert.").

**DISCUSSION**

### I. Wanetick's Qualifications

Though defendant first questioned Wanetick's
qualifications in a footnote, the court must nonetheless satisfy
itself that an expert who will offer opinion testimony is
qualified under FRE 702. Defendant argues that Wanetick is
unqualified because he is "self-taught" in patent valuation.
(Def. Mot. at 3 n.3.) Defendant cites to FRE 702's requirement
that an expert witness be qualified by either "knowledge, skill,
experience, training, or education" and argues that Wanetick and
plaintiffs have not established that he satisfies any of these
qualifications. (*Id.*) Plaintiffs respond by citing to
Wanetick's position as the managing director of Incremental
Advantage, LLC, a valuation company he founded in 2005, and his
years of experience valuing patents specifically. (Pl. Opp. at
9.) Plaintiffs further cite to Wanetick's "real-world
experience" which he described during his deposition testimony,
including: seven to nine years of valuing public and private

companies; employment at Merrill Lynch, and First Albany
Capital; writing a print newsletter related to stock
recommendations; publishing four books on industry analysis and
company valuation; and developing conferences and seminars
related to valuation, including some focused on intellectual
property. (*See, e.g.*, Wanetick Dep. at 11-12.) Wanetick
estimated that he had valued 75 patents outside the litigation
context, and that 97% of his patent valuation business was not
related to litigation.[6] (*Id.* at 12-13.) Finally, plaintiffs
point to Wanetick's Certified Patent Valuation Analyst Program,
a certification program which Wanetick created and administers
himself. (Pl. Opp. at 9.) Defendant responds that Wanetick
offered no insight into the substantive elements of his
certification program, and that the court should not take
plaintiffs at their word that the program is sufficient to
qualify Wanetick.

The court finds that although Wanetick's formal
education in patent valuation may be spare, his knowledge,
skill, and experience are sufficient as to qualify him to
calculate patent infringement damages in this case. It is not

---

[6]     These parameters imply that, at the time he prepared the Report,
Wanetick had valued a total of 77 or 78 patents, approximately 97% of which,
or 75 in total, were not related to patent infringement litigation. Thus, he
has valued two to three patents for purposes of litigation, but admits that,
prior to his engagement for this case, he had never prepared a damages report
or been accordingly deposed. (Wanetick Dep. at 28:7-11.)

necessary to credit his patent valuation certification to find

that Wanetick's opinion as to the value of patented intellectual

property is based on the requisite "knowledge, skill, experience

education, or training." If his deposition testimony is to be

credited, and the court finds no reason not to, then Wanetick

has been valuing patents for several years, and enjoys a steady

stream of clients and students. Plaintiffs need not demonstrate

that their expert is frequently retained for his opinion to be

helpful to the finder of fact.[7] The court finds that the jury,

as fact-finder, will find it helpful to hear Wanetick's

testimony regarding the damages calculations for defendant's

allegedly infringing products. Therefore, the court will

proceed to evaluate the admissibility of Wanetick's opinions as

contained in the Report.

## II. Damages

Defendant seeks to preclude Wanetick's opinion on

damages arising from plaintiffs' breach of contract, common law,

and patent infringement claims. Under 35 U.S.C. § 284, a

patentee that prevails on an infringement claim is entitled to

---

[7]    Plaintiffs argue that the "measure of damages" on their state common
law claims, "is the profits realized by Woodway" from the sale of the
allegedly infringing products, calculated by subtracting costs from revenue.
(Pl. Opp. at 6, 9.)  Plaintiffs appear to argue that an expert is unnecessary
to calculate lost profits.  (*Id.*)  Although courts need not admit expert
testimony that concerns an issue more appropriately decided by lay jurors
without the expert's help, the court finds that Wanetick's testimony on the
calculation of plaintiffs' common law damages will assist the jury.  *United
States v. Mulder*, 273 F.3d 91, 101 (2d Cir. 2001).

damages "adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court."  35 U.S.C. § 284.  Despite this broad language, "patentees tend to try to fit their damages cases into the 'lost profits' framework, or else fall back on the statutory grant of a reasonable royalty.'" *Pulse Med. Instruments, Inc. v. Drug Impairment Detection Servs., LLC*, 858 F. Supp. 2d 505, 514 (D. Md. 2012) (quoting *Mars, Inc. v. Coin Acceptors, Inc.*, 527 F. 3d 1359, 1366 (Fed. Cir. 2008)).

Plaintiffs' damages Report includes Exhibit A, which purportedly summarizes Woodway's profit margins on infringing sales from 2008 through 2014, although Wanetick's report states that he did not have the requisite sales information at the time he prepared his Report in July 2015.  Plaintiffs therefore appear to pursue a damages theory based on a reasonable royalty for the period after the '619 patent issued on November 13, 2012.

To determine a reasonable royalty, district courts often resort to the so-called "willing licensor-willing licensee" approach by considering a hypothetical negotiation between the parties, commencing on the date the alleged infringement began.  *Uniloc*, 632 F.3d at 1312; *Interactive Pictures Corp. v. Infinite Pictures, Inc.*, 274 F.3d 1371, 1384

(Fed. Cir. 2001). Courts typically accept expert testimony that calculates a reasonable royalty through the selection of a royalty rate which is then applied to a royalty base, the price of an infringing product expressed in dollars, to arrive at a royalty damages figure. *See, e.g.*, *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1388 (Fed. Cir. 2009); *LaserDynamics, Inc. v. Quanta Comput., Inc.*, 694 F.3d 51, 61, 68-69 (Fed. Cir. 2012); *On Track Innovations Ltd. v. T-Mobile USA, Inc.*, 106 F. Supp. 3d 369, 418-19 (S.D.N.Y. 2015).

The Report purports to calculate a reasonable royalty rate using various methodologies yielding royalty rates ranging from a high-end of 8%, (Rept. at 7), to a low of 4.2%, (*id.* at 7, 15), including two methodologies which both yield royalty rates of 5%, and a third methodology yielding a royalty rate of 5.8%, (*id.* at 7, 13, 14). Plaintiffs' expert Report also includes 20%, 15%, and 10% royalty rates drawn from requests by Astilean during the course of negotiations with Woodway's CEO, and similar offers made by Woodway, (Rept. at 8 nn.1-4), and offers made in March 2013 by a prospective licensee that included royalty rates of 7.5% and 5.0%, (*id.* at nn.5-6). The Report also includes a 5-6% royalty rate Astilean offered to another prospective licensee in 2009 along with requesting a $2 million upfront payment and a minimum yearly royalty of $200,000. (*Id.* at n.7.)

Additionally, a "patentee 'must in every case give evidence tending to separate or apportion . . . the patentee's damages between the patented feature and the unpatented features.'" *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 904 F.3d 965, 977 (Fed. Cir. 2018) (quoting *Garretson v. Clark*, 111 U.S. 120, 121 (1884)), *cert. denied*, No. 18-779, 2019 WL 887884 (U.S. Feb. 25, 2019). The Federal Circuit has held that "apportionment can be addressed in a variety of ways," including through selection of a royalty base that reflects a patented feature's added value or by adjusting the royalty rate so as to discount the value of the non-patented features. *ExMark Mfg. Co. Inc. v. Briggs & Stratton Power Prods. Grp., LLC*, 879 F.3d 1332, 1348 (Fed. Cir. 2018) (citing *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1226 (Fed. Cir. 2014)). Plaintiffs' expert noted that the patents-in-suit deserved "an enormous apportionment of the value associated with the Speedfit treadmills" because "the patents are essentially the product," given the lack of motors and other accouterments, but that some apportionment for the rubberized slats comprising the running surface was appropriate. (Rept. at 12.)

Defendant moves to preclude Wanetick's opinion as disclosed in the Report for several reasons. First, defendant argues that Wanetick failed to analyze, apportion, or even calculate damages stemming from plaintiffs' state law claims.

(Def. Mot. at 1.)  Second, defendant argues the 8% royalty *rate*
selected by Wanetick is not connected to the facts of the case
and cites to *ExMark*, 879 F.3d 1332 (Fed. Cir. 2018).  (*Id.* at
10.)  Next, defendant attacks the royalty *base* selected by
Wanetick in his Collective Damages Analysis, arguing, among
other reasons, that the selected base improperly uses the entire
market value rule, which considers the entire cost of the
accused product, and that the base includes non-infringing
sales.  (*Id.* at 25.)  Third, defendant points to several other
portions and aspects of the Report and argues they are
unsupported, speculative, or procedurally defective.  (*Id.* at
26-30.)

Plaintiffs respond that Wanetick's methods are well
tested, have a low "potential error rate," and have generally
been accepted by the business community.  (Pl. Opp. at 1.)
Plaintiffs also assert that Wanetick's experience and training
qualify him as an expert and that his methodologies are reliable
(*Id.* at 8-13.)  Plaintiffs further note that damages for common
law claims can be determined by lost profits.  (*Id.* at 9.)

## A.   Royalty Rate

Defendant argues that Wanetick did not sufficiently
explain his calculation of the royalty rate using the *Georgia-
Pacific* factors such that his reasonable royalty opinion was
cursory and not tied to the facts of the case.  (Def. Mot. at

13.)  Moreover, defendant asserts that the alternative royalty rates that Wanetick calculated do not satisfy *Daubert* because they are either not sufficiently tied to the facts of this case, untested and unreliable, or are not from comparable license agreements.  (*Id.* at 11-13; 15-19.)

Title 35 Section 284 does not prescribe a particular method to calculate a reasonable royalty, though the Federal Circuit has held that certain methods are speculative, and thus inadmissible, as a matter of law.  *See UniLoc*, 632 F.3d at 1315 (holding the "25% rule" for calculating a reasonable royalty was inadmissible).  Nevertheless, experts and courts have favored the oft-cited *Georgia-Pacific* analysis that considers 15 salient features of a patent infringement case to arrive at a royalty rate.  *See Georgia*-Pacific, 318 F. Supp. at 1120; *see also Pulse Med.*, 858 F. Supp. 2d at 514 ("[T]he Federal Circuit has repeatedly endorsed analysis of the *Georgia-Pacific* factors to estimate a reasonable royalty rate for the purposes of calculating patent damages.").  The Federal Circuit has also held that a "superficial recitation" of the *Georgia-Pacific* factors that is not sufficiently tied to the facts of the case is inadmissible.  *ExMark*, 879 F.3d at 1349-50.

*ExMark* is instructive.  There, the Federal Circuit excluded an expert's damages opinion because its treatment of the *Georgia-Pacific* factors "concluded with little explanation

that [the parties] would have agreed to [the] reasonable royalty rate." *Id*. The Expert "merely addressed the *Georgia-Pacific* factors in light of the facts and then plucked the [final] royalty rate out of nowhere." *Id*. at 1351. "'Reciting each [*Georgia-Pacific*] factor and making a conclusory remark about its impact on the damages calculation before moving on does no more than tell the jury what factors a damages analysis could take into consideration.'" *Id*. at 1350 (quoting *Whitserve, LLC v. Comput. Packages, Inc.*, 694 F.3d 10, 31 (Fed. Cir. 2012)).

Although Wanetick discussed each of the *Georgia-Pacific* factors and, for the most part, applied them to the facts of the case, his royalty rate opinion of 8% warrants exclusion. Like the expert in *Exmark*, Wanetick discusses the factors and considers some of the relevant aspects of this case pertinent to the selected factor. (Rept. at 9-12.) His Report also states what "direction" or "bias" a specific factor would have on the resulting royalty rate. (*Id.*) Nonetheless, without further discussion or explication, he arrives at a royalty rate of 8% as if "plucked" out of thin air. *ExMark*, 879 F.3d at 1351 ("It is not merely enough for an expert to simply assert that a particular royalty rate is reasonable in light of the evidence without tying the proposed rate to that evidence.").

This flaw is not limited to Wanetick's analysis of the *Georgia-Pacific* factors. Though he offers twelve other royalty

rates ranging from 4.2% to 20%, calculated using different methods, there is no basis articulated in the Report from which the court can determine why the 8% royalty rate was reasonable, or why the twelve other rates he calculated were not. Wanetick testified during his deposition that he found the 8% figure "more or less in the middle," of the 13 royalty rates he calculated and that "[a]t the end of the day it's a judgment." (Wanetick Dep. at 228:22-25.) Though an expert is entitled, and often relied on, to use her judgment, it must be supported by her knowledge, skill, experience, education, or training, the bases of the opinion must be tethered to the facts, and the opinion must ultimately be helpful to the jury. Fed. R. Evid. 702. Moreover, the bases informing her judgment must be sufficiently articulated such that the court can determine, as it is required to, whether the expert reasonably applied the methodology to the facts of the case. *See Nimely*, 414 F.3d at 396-97; *see also Commonwealth Sci. & Indus. Research Org. v. Cisco Sys., Inc.*, 809 F.3d 1295, 1302 (Fed. Cir. 2015) ("[W]here the data used is not sufficiently tied to the facts of the case, a damages model cannot meet the substantive statutory requirement of apportionment of royalty damages to the invention's value.*"* (internal quotation marks and citations omitted)). Here, Wanetick has not provided a sufficient basis, much less an explanation or calculation, to admit the 8% royalty

rate.  For these reasons, the court finds that the 8% royalty
figure is unsupported, and insufficiently tied to the facts of
this case, and will be precluded.

The Report, however, provides other royalty rates and
discusses the methods Wanetick used to calculate these
alternative royalty rates.  Defendant notes that Wanetick
admitted at his deposition that he was not aware whether one of
these alternative methods that he discussed in his Report, the
Black-Scholes formula, was used by others to calculate a
reasonable royalty rate for patent infringement damages.  (*See*
Wanetick Dep. at 179:1-3.)  Defendant, however, identifies no
case law indicating that the alternative methods used by
Wanetick are not reliable.  In *Pulse Medical*, 858 F. Supp. 2d
505 (D. Md. 2012), cited by plaintiffs, the district court found
that using an alternative method to calculate a reasonable
royalty was appropriate when the facts of the case called for
such treatment, and when the expert sufficiently tied his use of
the alternative to such facts.  *Pulse Med.*, 858 F. Supp. 2d at
514 ("[A]s a matter of law, analysis of the *Georgia-Pacific*
factors . . . are not the only method[] of assessing potential
damages."); *see also Mars, Inc.*, 527 F.3d at 1366 ("The correct
measure of damages is a highly case-specific and fact-specific
analysis.").  Because Wanetick's Report discloses alternative
methods to determine damages through a reasonable royalty rate,

he may testify as to those methods, and their resulting damages and royalty rates as applied to the facts of this case.  The court reiterates, however, that his conclusory royalty rate of 8% is precluded.

The court now turns to the comparator licensing arrangement and the eight proposed licensing deals involving Speedfit, including some that involved Woodway as potential licensee, which Wanetick used in his royalty rate analysis. "When relying on licenses to prove a reasonable royalty," a loose or vague comparison between different technologies or licenses will not suffice.  *LaserDynamics*, 694 F.3d at 79. Moreover, the comparison must consider differences in technologies and the economic circumstances of the parties to the contract.  *VirnetX*, *Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1330 (Fed. Cir. 2014) (citing *Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1211 (Fed. Cir. 2010)).  Actual licenses to the patents-in-suit, rather than comparable licenses, "are probative not only of the proper amount of a reasonable royalty, but also of the proper form of the royalty structure." *LaserDynamics*, 694 F.3d at 79-80.

Though Wanetick did not ultimately settle on any of the royalty rates included in the proposals or comparator license he identifies, he may testify as to these comparisons to explain to the jury how a reasonable royalty rate may be

determined.  The proposed Speedfit licensing arrangements that were ultimately rejected may be probative of the value of the technology or a reasonable royalty, particularly where defendants' representatives offered specific royalty rates.  In short, Wanetick may testify how the proposals are sufficiently comparable to the hypothetical license in this case.  Thus, testimony concerning the proposed license arrangements and the comparator license is not precluded.

## B.    Royalty Base

The court next turns to the Report's selection of a royalty base.  As an initial matter, the Report requires updated sales figures from Woodway to calculate a royalty base for the time period covering defendant's alleged infringement. Specifically, as the court determined on December 28, 2016, plaintiffs lacked standing to sue for infringement before June 1, 2015, the date that Bostan and plaintiff Astilean assigned their respective interests in the patents-in-suit to plaintiff Speedfit.  *Speedfit*, 226 F. Supp. 3d at 157.  Wanetick prepared the Report before that decision issued, and used only Woodway's available sales figures up through 2014.  Accordingly,

plaintiffs' Supplemental Complaint, filed February 10, 2017,

only seeks damages for infringement beginning June 1, 2015.[8]

The Federal Circuit has explained that, "where multi-
component products are accused of infringement, the royalty base
should not be larger than the smallest salable unit embodying
the patented invention." *Power Integrations*, 904 F.3d at 977.
When an accused product contains "other valuable features,"
patented or not, that contribute to consumer demand, "then the
damages for patent infringement must be apportioned to reflect
only the value of the patented feature." *Id.* at 978. "The
ultimate combination of royalty base and royalty rate must
reflect the value attributable to the infringing features of the
product, and no more." *Ericsson*, 773 F.3d at 1226.

There is an exception to this general rule of
apportionment, however. "The entire market value rule allows
for the recovery of damages based on the value of an entire
apparatus containing several features, when the feature patented
constitutes the basis for consumer demand." *Lucent*, 580 F.3d at

---

[8]     Defendant points out that the Report does not refer to a date for the
hypothetical negotiation which is said to take place on the first date of the
alleged infringement. *Radio Steel & Mfg. Co. v. MTD Prods., Inc.*, 788 F.2d
1554, 1557 (Fed. Cir. 1986).  Though plaintiffs have not responded to this
argument, the court notes that the Report does at least refer to the date
that common law damages started to accrue, and an initial infringement date,
even if it does not explicitly rely on the date as a basis for comparing the
licensing proposals which were offered at various other dates.  This issue
may be explored by defendant on cross-examination to undercut Wanetick's
patent damage analysis.  Given that plaintiffs' infringement claims accrued
after assignment on June 1, 2015, there remains an open question as to when
the alleged infringement began and when a hypothetical negotiation would have
taken place.

1336 (quoting *TWM Mfg. Co., Inc. v. Dura Corp.*, 789 F.2d 895, 901 (Fed. Cir. 1986)). But, to satisfy the rule, the patentee must establish that "the patented feature creates the 'basis for customer demand' or 'substantially create[s] the value of the component parts.'" *Uniloc*, 632 F.3d at 1318 (quoting *Lucent*, 580 F.3d at 1336). This alternative has been described as "demanding." *Power Integrations*, 904 F.3d at 977. The Federal Circuit has held that apportionment can also be accomplished by adjusting the royalty rate, rather than the royalty base, or by adjusting both the rate and the base. *ExMark*, 879 F.3d at 1348.

Defendant argues that the accused product includes many other features such that it is improper to apply the entire market value rule without explanation. (Def. Mot. at 25.) Plaintiffs' Report appears to address this argument by describing the patents-in-suit as "essentially the product" because "the product consists of far fewer moving parts than motorized treadmills," among other reasons, when completing his *Georgia-Pacific* analysis. (Rept. at 12.) Wanetick goes on to "acknowledge[] that Woodway does deserve some apportionment for its rubberized slat running surface design." (*Id.*) Wanetick's concession that at least the rubberized slats of the accused product could be apportioned, thus reduces damages, and exposes his application of the entire market value rule to cross-examination, rather than preclusion. In any event, the Report

is not clear if, or how, Wanetick apportions the non-infringing features, whether through the royalty base or the royalty rate. At bottom, the Report acknowledges that apportionment for the rubberized slats is appropriate for the patents-in-suit, though it is unclear how Wanetick accounts for this. Given that Wanetick's royalty *rate* analysis likewise did not clearly apportion for non-patented features, the court finds that Wanetick's royalty base opinion must include the apportionment for the rubberized slat running surface.

The court finds that Wanetick appears to have mistakenly calculated patent infringement damages for the period before the first patent-in-suit issued on November 13, 2012, when infringement damages would begin to accrue, by applying his selected royalty rate to Woodway's alleged infringing sales for years 2009, 2010, and 2011. (Rept. at 6.) The Report similarly appears to apply a royalty rate to all infringing sales in 2012 without considering what portion of Woodway's annual sales in 2012 resulted from sales before November 13, 2012. Implicit in Whelan's decision to partition the applicable damages periods according to the issue date of the patents-in-suit is that the first period could not include patent infringement damages. The Report's Collective Damages Analysis chart, therefore, shall not be read to apply a royalty rate or calculate patent damages for Woodway's sales in the years 2009, 2010, and 2011, and up to and

including November 12, 2012, well before the patent issued. (Rept. at 6; Wanetick Dep. at 126:8-127:7.) Furthermore, the court agrees with defendant that applying a royalty rate to Woodway's sales during the period prior to June 1, 2015 is also inappropriate because Speedfit and Astilean lacked standing to bring an infringement claim prior to the assignment by co-inventors Bostan and Astilean of such rights to Speedfit. *See Speedfit*, 226 F. Supp. 3d at 156-67. Thus, Wanetick's calculated royalty payments between 2009 and June 1, 2015, before the assignment of the patents-in-suit to the plaintiffs, is precluded. Therefore, plaintiffs' pre-June 1, 2015 damages are limited to Astilean's and Speedfit's common law claims, and Wanetick may testify regarding these claims as reflected in his Report.

### C. Upfront Payment

Defendant next challenges the $275,000 upfront payment which Wanetick concluded should be added to a damages award for infringement. (Def. Mot. at 23.) Woodway argues that Wanetick offers no facts to support this payment and further offers neither an established method for calculating such a payment nor points to specific comparable licensing arrangements. (*Id.*) Plaintiffs do not respond to this challenge. The Report states that inventors commonly seek and receive upfront payments when "bringing their inventions to companies with whom they partner."

(Rept. at 4.)  Wanetick first points to an alleged offer of settlement from Woodway.[9]  (*Id*.)  He then notes that Woodway's claimed initial investment of $150,000 is a reasonable upfront payment, and to this initial investment, he applies an 18% rate of return typically expected by venture capital investors into a late-stage target to arrive at a total payment of $275,000. (*Id*. at 4-5.)  He concedes that he has "not received any information as to what rate of return Woodway typically seeks" when undertaking new initiatives, and ultimately concludes that the 18% figure "seems reasonable."  (*Id.* at 5.)

Wanetick does not point to examples of licensing arrangements between the parties or comparators that include such an upfront payment along with running-royalties, let alone arrangements sufficiently comparable to the facts of this case. Moreover, the 18% return on investment figure is equally as speculative.  There is an insufficient basis for the court to conclude that the parties would have agreed to such an upfront payment in any hypothetical negotiation.  *Lucent*, 580 F.3d at 1325 ("[Patentee] had the burden to prove that the licenses were sufficiently comparable to support the lump-sum damages award.");  *see also Worldtech Sys., Inc. v. Integrated Networks Sols., Inc.*, 609 F.3d 1308, 1319-20 (Fed. Cir. 2010).  The

---

[9]     The court notes that use of this evidence would be inadmissible at trial under Federal Rule of Evidence 408.

upfront payment is speculative, conjectural, and is precluded from the damages calculation in Wanetick's testimony.

### D.   Other Challenges

Defendant next moves against several other portions of the Report as unsupported or irrelevant with regard to the calculation of damages.  (Def. Mot. at 26-30.)  Plaintiffs failed to respond to defendant's arguments as to any of these sections.  (Def. Reply at 10.)  Specifically, defendant seeks to exclude (1) Exhibit B which discusses the advantages of motorless treadmills over motorized treadmills; (2) the narrative section on the first two pages of the Report; (3) Wanetick's comments on the longevity of treadmills; (4) Wanetick's comment about a patent examiner's thoroughness; and (5) Wanetick's statement in the royalty rate analysis that "the patents are essentially the product."  (Def. Mot. at 26-30.)

As discussed above, testimony regarding item (5), the apportionment issue, may be admitted as part of the royalty rate analysis.  The court finds that the subject matter of certain other challenged portions of the Report may be helpful to the jury's understanding of the evidence and determination of the facts, while other challenged subjects are unsupported or irrelevant and should be excluded.  First, with respect to item (1), Wanetick admitted in his deposition that facts relevant to his opinion in Exhibit B regarding the advantages of motorless

treadmills, were easily found through an internet search. (Wanetick Dep. at 61:8-11.) During his deposition, Wanetick also stated that he based his opinion on the advantages and disadvantages of manual treadmills from his experience "frequent[ing] gyms and hotels that have fitness centers" and his ownership of a treadmill. (*Id.* at 190:13-20.) Wanetick does not purport to be an expert on treadmills, and his experience with treadmills comports with that of a layperson, not an expert. (*Id.* at 110:20-21.) Astilean is a more appropriate witness to discuss the advantages of manual treadmills and the longevity of treadmills (item (3)), and Wanetick may not offer such opinions under FRE 702 as to items (1) or (3).

Further, with respect to item (2), the narrative statements included in the beginning of the Report are fairly viewed as an introduction, and are excluded from the body of his damages Report by Wanetick himself—he concludes this introductory portion with "I was tasked with preparing a damages report . . . that is what follows." (Rept. at 2.) The introductory language summarizes Wanetick's understanding of the parties' dispute in general. Plaintiffs have not argued that Wanetick's introduction is relevant to his opinion regarding the calculation of damages. Thus, it too warrants preclusion. As for item (4), plaintiffs do not address defendant's objection to

footnote 4 of the Report, which references the patent examiner at the U.S. Patent and Trademark Office and his experience. The court finds that Wanetick's opinion on this issue is irrelevant and Wanetick's opinion regarding the patent examiner's qualifications is precluded.

Finally, defendant's arguments for preclusion of Wanetick's opinions regarding state law damages calculations are noted and are denied because the Report sets forth adequate bases for state law damages. (*See, e.g.*, *id.* at 3, 6, 19.)

**CONCLUSION**

For the reasons discussed above, defendant's motion is GRANTED in part and DENIED in part. Wanetick may not testify that the 8% figure is a reasonable royalty rate or that it is consistent with an application of the *Georgia-Pacific* factors. He may, however, testify as to the application of the *Georgia-Pacific* factors to the facts of the case. Wanetick may also testify to the alternative methods he used to calculate a reasonable royalty as disclosed in his Report. He may offer opinion testimony as to the comparator license and other licensing proposals discussed in the Report, so long as he ties the same to the facts of this case. Wanetick may not offer testimony concerning the $275,000 "upfront payment" and the 18% rate of return. Moreover, any testimony by Wanetick concerning an appropriate royalty base must also apportion for at least the

rubberized running surface of the accused product. Wanetick may
not testify as to patent infringement damages prior to June 1,
2015, but may offer testimony consistent with his Report
concerning damages for plaintiffs' state common law claims
during that period. Finally, Wanetick may not testify as to the
advantages and longevity of motorless treadmills, the
introductory discussion included in the first two pages of the
Report, or footnote 4 of the Report.


**SO ORDERED.**

Dated: Brooklyn, New York
        March 29, 2019

                            _____/s/_____
                            **KIYO A. MATSUMOTO**
                            United States District Judge
                            Eastern District of New York