UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------X
SPEEDFIT LLC and AUREL A.
ASTILEAN,

     *Plaintiffs*,

   -against-

WOODWAY USA, INC.,

     *Defendant*.
---------------------------------X

**MEMORANDUM & ORDER**
13-CV-1276 (KAM)(AKT)

**MATSUMOTO, United States District Judge:**

      Plaintiffs Speedfit LLC ("Speedfit") and Aurel A.
Astilean ("Astilean") (collectively, "plaintiffs") commenced the
instant action against Woodway USA, Inc. ("Woodway" or
"defendant"), alleging that Woodway wrongfully infringed upon
United States Patent No. 8,308,619 ("the '619 Patent") and
United States Patent No. 8,343,016 ("the '016 Patent" and
together with the '619 Patent, the "patents-in-suit"), both of
which are owned by Speedfit and relate to a manually-powered
treadmill involving a closed-loop treadmill belt designed to
maintain a concave running surface and taut lower portion.  (ECF
No. 150, Supplemental Complaint ("Supp. Compl.") ¶¶ 18-21.)
Before the court is Woodway's *Daubert* motion seeking to preclude
the expert testimony offered by James Whelan, plaintiffs'
technical expert, concerning Provisional Patent Application No.
61/280,265 (the "'265 provisional").  (ECF No. 211, Def. Mem.)

The court has already granted in part and denied in part Woodway's concurrently filed *Daubert* motion challenging plaintiffs' damages expert, David Wanetick. (*See* ECF No. 240.)

**BACKGROUND**

The court assumes familiarity with the factual background and procedural history of this case as set forth in, most recently, the court's Order deciding defendant's *Daubert* motion against Wanetick, and the several other decisions in this matter. *See Speedfit LLC, et. al. v. Woodway USA, Inc.*, 53 F. Supp. 3d 561 (E.D.N.Y. 2014) (denying Woodway's motion to dismiss and motion to transfer); *Speedfit LLC, et. al. v. Woodway USA, Inc.*, No. 13-CV-1276, 2015 WL 6143697 (E.D.N.Y. Oct. 19, 2015) (granting leave to file a Third Amended Complaint); *Speedfit LLC, et. al. v. Woodway USA, Inc.*, 226 F. Supp. 3d 149 (E.D.N.Y. 2016) (granting in part and denying in part Woodway's motion to dismiss Third Amended Complaint); *Speedfit LLC, et. al. v. Woodway USA, Inc.*, No. 13-CV-1276, 2017 WL 5633113 (E.D.N.Y. Nov. 20, 2017) (construing claim term "means for slackening").

Defendant moves against Whelan's opinions as disclosed in his report dated July 27, 2015 (the "Report"). (ECF No. 212-1, Expert Report of James Whelan ("Rept.").) The 62-page Report addresses Whelan's assignment "to determine if the invention as described in the ['265] provisional patent application was

2

sufficient to allow one to make the invention as claimed in [the patents-in-suit]." (*Id.* at 3.)

Whelan approached his assignment by "construct[ing] test fixtures and [testing] the inventions disclosed in the provisional patent application and claimed in the [patents-in-suit]," and by then comparing the performance of these test fixtures. (*Id.*) The Report begins with a list of materials Whelan reviewed in forming his opinions, including: the patents-in-suit and the '265 provisional; 275 digital photographs of the leg-powered treadmill; seven colored drawings of the leg-powered treadmill; 49 colored photocopied drawings and photographs of the leg-powered treadmill and unspecified additional images; and the Second Amended Complaint in this action. (*Id.*) As enclosures, the Report includes the '265 provisional patent application and both of the issued patents-in-suit. (*See* Rept. App. A-C.)

The Report also excerpts the '265 provisional, which discloses a method for holding the treadmill's lower belt portion taut: "Springs (not shown) exert spring urgency in opposite directions holding taut the length of the lower belt portion in a dimension of approximately twenty-three inches." (Rept. at 4.) The Report also summarizes and excerpts the relevant claims of both patents-in-suit, (*id.* at 6-10), and then describes the six test structures Whelan created for his

assignment, (*id.* at 10-21).  The test structures include one control model with no "method of keeping the lower belt portion taut," (*id.* at 20-21), two models "constructed to be consistent with the description of the ['265 provisional]," (*id.* at 10-14), and three models "constructed to be consistent with what was claimed and contained in the description of [the patents-in-suit]," (*id.* at 14-20).  Whelan loaded each of these test structures with a weight and noted whether the upper belt portion retained concavity and whether the lower belt portion was taut; he made similar observations of each model in an unloaded state.  (*See, e.g.*, *id.* at 16-17.)  All the test models included a frame representing the treadmill's two-sided frame, and a closed loop belt supported by two end rollers.  (*Id.* at 10-11; *id.* at 11 fig.5.)

The first model Whelan built to conform to the disclosures in the '265 provisional used a "spring loaded in tension, such that the resultant load was in opposite directions at the spring's end (sic) and held taut the lower belt portion." (*Id.* at 11 fig.5.)  The second model used a "leaf spring loaded in bending, such that the resultant load was in opposite directions at the spring's end and midpoint, [and] held taut the lower belt portion."  (*Id.* at 12 figs.7 & 8.)  As depicted in the Report's Figures 7 and 8, a leaf spring appears to be a thin rectangular length of metal.

4

The three models Whelan built to conform to the patents-in-suit generally track the specifications of the '016 Patent, (*see* ECF No. 220-3, Ex. C, '016 Patent, col.4 l.61), which describe the patents' "means-for-slackening." *See Speedfit*, 2017 WL 5633113, at *7 (construing "means-for-slackening" as "limited to only those structures specifically disclosed in ['016 Patent's] specification, namely, Figures 2, 3, and 4"). For the first of these three models, depicted in figures 10 and 11, Whelan used a so-called timing belt attached to the end rollers to maintain synchronous motion between the belts and rollers such that the upper portion maintained concavity. (Rept. at 14-15 figs.10 & 11.) Another model used a "flat support belt," side-pulleys, and springs to keep the support belt taut and in contact with the lower portion of the closed loop belt. (*Id*. at 16-17 figs.13 & 14.) The flat support belt thus supported the lower portion of the closed loop belt and "prevent[ed] it from drooping down." (*Id.* at 16.) And a third model used two bearings to "physically support the closed loop treadmill belt lower portion preventing drooping." (*Id.* at 18-19 figs.17 & 18.) Whelan loaded each of these models with a small plate to simulate a user's weight. In both the loaded and unloaded states, Whelan observed whether the upper belt portion maintained concavity and whether the lower belt portion remained taut. (*See, e.g.*, *id*. at 17-19.)

Whelan concluded that: (1) the '265 provisional "disclosed and [the patents-in-suit] claimed common elements;" (2) the '265 provisional disclosed "different methods for keeping the [treadmill's] lower belt portion taut" than the [patents-in-suit] did; and (3) the different methods claimed in the patents-in-suit "were mechanical and performed similar[ly] as to the method disclosed in the ['265 provisional]." (*Id.* at 25.)

Whelan also completed a Rebuttal report (the "Rebuttal"), and on August 26, 2015, plaintiffs served this Rebuttal on defendant. (*See* ECF No. 212-2, Whelan Rebuttal Report ("Rebuttal").) Among other contentions, Whelan's Rebuttal specifically responds to the report of defendant's technical expert, Dr. Kim Blair, which concluded, *inter alia*, that the patents-in-suit are invalid as anticipated. (*Id.* at 12; *see also* ECF No. 214, Report of Dr. Kim Blair ("Blair Rept.") at 2, 32, 35-37.) Dr. Blair's report further concluded that Nicholas Oblamski, Woodway's engineer, "is an inventor of certain of the subject matter of the [patents-in-suit]" and that "clear and convincing evidence" establishes that Oblamski "conceived of and reduced to practice a synchronous belt" system without any contribution from Astilean or Bostan. (Rebuttal at 12; Blair Rept. at 3, 33.)

In response to Blair's conclusion, Whelan cites the Manual of Patent Examining Procedure's ("MPEP") standard for rejection under 35 U.S.C. § 102(f). (Rebuttal at 13; *see also* MPEP § 2137.01.) He notes that "file material" he reviewed documented Astilean's conception and invention of the treadmill prototype in August 2008, and that the same prototype used an "alternative method" for slackening. (Rebuttal at 13.) The Rebuttal is unclear as to what the alternative method entails, and to which method it should be compared. Whelan also notes that Oblamski and Astilean "collaborated in building the production leg-powered treadmill" by 2009, but that Astilean had already disclosed the need for a means for slackening earlier, in December 2008. (*Id.*) Whelan points out that Oblamski worked on a metal production model of the wooden prototype "starting around December 2008 and early 2009." (*Id.*) This metal production model, the Speedboard 2, used a synchronous belt system to "keep the lower belt portion taut and the upper belt portion concave." (*Id.*) Whelan then concludes that the patents-in-suit "are not invalid under [§] 102(f)," and that the "file material does not suggest that Mr. Oblamski conceived or was developing a leg-powered treadmill with a lower belt portion taut and the upper belt portion concave prior to working with Mr. Astilean." (*Id.*) Whelan finally concludes that the "file

7

material suggests" that Oblamski was neither the inventor nor co-inventor of the leg-powered treadmill.  (*Id.*)

**LEGAL STANDARD**

**I.    Expert Testimony**

**A.    Applicable Authority**

As with the court's Order deciding defendant's *Daubert* motion against plaintiffs' expert Wanetick, the court applies the law of the Federal Circuit to patent issues, and the law of its regional circuit, the Second Circuit, to non-patent and evidentiary issues.  *In re Cambridge Biotech Corp.*, 186 F.3d 1356, 1368 (Fed. Cir. 1999); *see also Coconut Grove Pads, Inc. v. Mich & Mich TGR, Inc.*, 222 F. Supp. 3d 222, 250 n.6 (E.D.N.Y. 2016).  Thus, questions pertaining to Whelan's patent-related opinions are governed by Federal Circuit authority, and questions pertaining to the admissibility of expert witness testimony offered under Federal Rule of Evidence 702 ("FRE 702") or a party's required witness disclosures under Federal Rule of Civil Procedure 26 ("Rule 26") are governed by Second Circuit authority.

**B.    Federal Rule of Civil Procedure 26**

Before reaching the merits of defendant's *Daubert* challenge, however, the court will first address plaintiffs' compliance with Rule 26.  Rule 26(a)(2)(B) requires parties

provide a report for each retained expert witness that
discloses:

> (i)    a complete statement of all opinions the witness
> will express and the basis and reasons for them;
>
> (ii)    the facts or data considered by the witness in
> forming them;
>
> (iii)    any exhibits that will be used to summarize or
> support them;
>
> (iv)    the witness's qualifications, including a list
> of all publications authored in the previous 10
> years;
>
> (v)    a list of all other cases in which, during the
> previous 4 years, the witness testified as an
> expert at trial or by deposition; and
>
> (vi)    a statement of the compensation to be paid for
> the study and testimony in the case.

Fed. R. Civ. P. 26(a)(2)(B).  Rule 26 "guards against the
presentation of sketchy and vague expert reports that provide
little guidance to the opposing party as to an expert's
testimony." *Conte v. Newsday, Inc.*, No. 06-CV-4859, 2011 WL
2671216, at *4 (E.D.N.Y. July 7, 2011).

This disclosure requirement is designed to prevent a
party from raising unexpected or new evidence at trial.  *Id.*;
*Harkabi v. SanDisk Corp.*, No. 08-CV-8203, 2012 WL 2574717, at *3
(S.D.N.Y. June 20, 2012) ("The purpose of the expert disclosure
rules is to avoid surprise or trial by ambush." (internal
quotation marks omitted)); *Ebewo v. Martinez*, 309 F. Supp. 2d
600, 607 (S.D.N.Y. 2004).  Pursuant to Federal Rule of Civil

Procedure 37 ("Rule 37"), the court may preclude a party from using information or an expert witness if the relevant disclosures "are insufficiently detailed and complete to satisfy Rule 26(a)(2)." *Conte*, 2011 WL 2671216, at *4; *see also Ebewo*, 309 F. Supp. 2d at 606-07.

Defendant does not directly argue Whelan's Report should be precluded pursuant to Rules 26 or 37. However, the court notes that the Whelan reports submitted with the parties' motion papers did not appear to include: a list of Whelan's qualifications, including publications he wrote in the previous ten years, Fed. R. Civ. P. 26(a)(2)(B)(iv); a list of cases in which he testified as an expert, *id.* (a)(2)(B)(v); or a statement of his compensation for his work on this case, *id.* (a)(2)(B)(vi).[1] The court, therefore, orders plaintiffs to amend their disclosures to rectify these apparent deficiencies, if they have not already done so, no later than the next scheduled conference in this matter.

## C.    Federal Rule of Evidence 702

FRE 702 governs the admissibility of expert testimony. Fed. R. Evid. 702. Whereas Rule 26 guards against the disclosure of expert reports that provide little guidance to the opposing party as to an expert's testimony, FRE 702 guards

---

[1]      The court notes that plaintiffs' opposition to the instant motion attaches Whelan's Curriculum Vitae. (*See* ECF No. 220-5, Ex. E.)

against the presentation of insufficiently reliable evidence to the fact-finder. *Conte*, 2011 WL 2671216, at *4. FRE 702 permits expert testimony where:

(a)     the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b)     the testimony is based on sufficient facts or data;

(c)     the testimony is the product of reliable principles and methods; and

(d)     the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

District courts serve as the "gatekeeper" to ensure that, in accordance with FRE 702, an "expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007) (quoting *Daubert v. Merrell Dow Pharm.*, 509 U.S. 579, 597 (1993)). "The district court has broad discretion to carry out this gatekeeping function." *In re Pfizer Inc. Sec. Litig.*, 819 F.3d 642, 658 (2d Cir. 2016). The district court must "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999). The

proponent of the expert testimony has the burden of establishing the admissibility of the evidence under *Daubert*. *In re Pfizer*, 819 F.3d at 658.

District courts also must ensure that "any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Nimely v. City of New York*, 414 F.3d 381, 396 (2d Cir. 2005) (internal quotation marks omitted) (quoting *Daubert*, 509 U.S. at 589). Before admitting expert testimony under FRE 702 and *Daubert*, the district court should make the following determinations: (1) "whether the witness is qualified to be an expert;" (2) "whether the opinion is based upon reliable data and methodology;" and (3) "whether the expert's testimony on a particular issue will assist the trier of fact." *Marini v. Adamo*, 995 F. Supp. 2d 155, 179 (E.D.N.Y. 2014) (citing *Nimely*, 414 F.3d at 396-97).

To be reliable, FRE 702 "requires a sufficiently rigorous analytical connection between th[e] methodology and the expert's conclusions." *Nimely*, 414 F.3d at 396. "[T]oo great an analytical gap between the data and the opinion proffered" warrants exclusion. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). Thus, an expert opinion that "is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached" is unreliable and should be excluded. *Nimely*, 414 F.3d at 396-97 (citing *Amorgianos v. Nat'l R.R.*

*Passenger Corp.*, 303 F.3d 256, 266 (2d Cir. 2002)); *see also*
*Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir.
1996) ("[E]xpert testimony should be excluded if it is
speculative or conjectural."); *Uniloc USA, Inc. v. Microsoft
Corp.*, 632 F.3d 1292, 1315 (Fed. Cir. 2011) ("If the patentee
fails to tie the theory to the facts of the case, the [expert]
testimony must be excluded.").  Accordingly, conclusory opinions
often provide an insufficient basis upon which to assess
reliability.  *Estate of Jaquez v. City of New York*, 104 F. Supp.
3d 414, 426 (S.D.N.Y. 2015) (citing *Nimely*, 414 F.3d at 396);
*see also Gen. Elec.*, 522 U.S. at 146 ("[N]othing in either
*Daubert* or the Federal Rules of Evidence requires a district
court to admit opinion evidence that is connected to existing
data only by the *ipse dixit* of the expert.").

**DISCUSSION**

### I.  Whelan's Qualifications

Defendant does not appear to challenge Whelan's
qualifications or point to a lack thereof.  Though defendant
argues Whelan has not defined the relevant person of ordinary
skill in the art ("POSITA"), the court addresses that argument
below in considering the reliability of Whelan's opinions.
Plaintiffs nevertheless argue that Whelan is qualified in their
opposition to the instant motion, (Pl. Opp. at 13-14), and cite
to Whelan's deposition testimony in which he acknowledges, in

part, a proposed definition of POSITA, (ECF No. 213-1, Whelan Dep. at 130:16-133:9). In any event, the court must satisfy itself that Whelan is qualified before admitting his opinion testimony under FRE 702.

Defendant's expert defined the POSITA as an individual possessing either a Bachelor of Science degree in mechanical engineering, or at least two years of relevant experience in the treadmill industry, "including experience and knowledge of the design construction, testing, and operation of manual treadmills." (Blair Rept. at 7.) Though Whelan's Report does not appear to disclose his Curriculum Vitae, plaintiffs represent that Whelan holds a Bachelor of Science degree in mechanical engineering from Lehigh University and that he is a licensed Principal Engineer. (Pl. Opp. at 14.) Once again, defendant does not challenge this representation. Accordingly, the court finds that Whelan qualifies as a POSITA, and moreover, that he may offer opinion testimony that conforms to the remaining requirements of FRE 702.

## II. Priority

Defendant seeks to preclude Whelan's opinions as expressed in the Report. However, the parties appear to dispute what Whelan's ultimate opinions are. Defendant contends Whelan's opinion attempts to support plaintiffs' priority claim, that is, whether the patents-in-suit can claim the priority

14

filing date of the '265 provisional under 35 U.S.C. § 119.[2]

(Def. Mem. at 1.)  Plaintiffs counter by arguing the U.S. Patent

and Trademark Office ("USPTO") already determined priority, (Pl.

Opp. at 3), and that an expert's opinion as to a legal

conclusion is inadmissible, (*id.* at 2).

Whelan's Report does not appear to make a priority

determination outright, but plaintiffs concede that the March

2009 IHRSA tradeshow release of the Woodway Curve could

constitute disclosure of prior art if not for the '265

provisional's priority filing date.  (*Id.* at 4-5.)  Plaintiffs

also claim that what was disclosed at the March 2009 show "was

not the Woodway Curve, but the Speedfit Speedboard."[3]  (*Id.; see*

*also* ECF No. 231-4, Ex. D.)  In Whelan's Rebuttal, plaintiffs

also counter the purported prior art disclosures of Woodway's

Curve at the March 2009 IHRSA tradeshow by citing to a February

2009 episode of the television show "Wreckreation Nation" which

featured Speedfit's prototype curved manual treadmill.  (*See*

Rebuttal at 9.)

---

[2]    This case is governed by the statutory provisions in effect before the
Leahy-Smith America Invents Act ("AIA") went into effect.  Pub. L. No. 112-
29, 125 Stat. 284, 285-93 (2011); *see* AIA § 3(n)(1), 125 Stat. at 293
(applying the relevant AIA amendments only to applications and patents
containing a claim with an effective filing date of March 16, 2013, or
later); *see also Fleming v. Escort Inc.*, 774 F.3d 1371, 1374 n.1 (Fed. Cir.
2014).

[3]    The '619 Patent bears a filing date of October 29, 2010, and the '016
Patent bears a filing date of November 1, 2010.  (ECF No. 220-2, Ex. B, '619
Patent; ECF No. 220-3, Ex. C, '016 Patent.)  The March 2009 offering of the
Speedboard/Curve occurred more than one year prior to these filings, and
could constitute invalidating prior art if not for the '265 provisional.  *See*
35 U.S.C. §§ 102(a)-(b) (2000).

Plaintiffs appear to disavow that they must establish priority, relying on the USPTO's issuance of the patents-in-suit to arguably establish priority. (*Id.* at 3.) Plaintiffs nevertheless argue enablement, an element of a priority determination, by offering Whelan's opinion that the '265 provisional satisfies 35 U.S.C. § 112's enablement requirement.[4] A patentee may establish enablement of a *patent* when countering an invalidity defense for lack of enablement, but Whelan's opinion concerns enablement of the '265 provisional, not the patents-in-suit. (Rept. at 3.)

Defendant moves to preclude Whelan's opinion for several reasons. First, defendant argues the Report is unreliable because Whelan did not identify or establish the relevant POSITA as a threshold matter. (Def. Mem. at 15.) Second, defendant argues Whelan ignored the "written description" requirement of 35 U.S.C. § 112. (*Id.* at 18.) Third, defendant argues Whelan's enablement analysis methodology is unreliable as it ignores the legal standard for priority. (*Id.* at 20.) Fourth, defendant argues Whelan did not separately assess anticipation and that Whelan's opinion is contrary to this court's construction of the term "means-for-slackening." (*Id.* at 23.) Finally, defendant argues that Whelan's opinion as

---

[4] Pre-AIA enactment, 35 U.S.C. § 112(a) was codified in § 112 ¶ 1.

to derivation included in his Rebuttal to Blair's report is not based on sufficient facts.  (*Id.* at 24.)

Plaintiffs respond first by arguing the USPTO determined priority in issuing the patents-in-suit, each of which listed the '265 provisional as a reference, along with prior art such as the January 2009 feature of the Speedboard in a television broadcast and the March 2009 display of the Speedboard/Curve at the IHRSA trade show.  (Pl. Opp. at 3; *see also* '619 Patent, '016 Patent.)  Plaintiffs next point to Whelan's qualifications arguing they satisfy Woodway's own definition of a POSITA.  (*Id.* at 13.)  Next, plaintiffs argue Whelan's testing did not ignore the written description requirement of § 112 and further that Whelan did not conflate enablement and priority.  (*Id.* at 14-16.)  Plaintiffs concede, however, that Whelan did not separately consider anticipation but appear to argue that such analysis is not necessary to admit his opinion.  (*Id.* at 18.)  Finally, plaintiffs deny that Whelan's opinion contradicts this court's claim construction and respond that defendant failed to identify the specific contradiction.  (*Id.* at 19.)

## A.    35 U.S.C. § 112

Regardless of whether Whelan opines ultimately on priority or enablement as a required element, the court shall begin its analysis of the admissibility of Whelan's opinion by

17

considering the requirements of 35 U.S.C. § 112.  Provisional

patent applications must include a "specification as prescribed

by the first paragraph of [§] 112."  35 U.S.C. § 111(b)(1)(A)

(2002).  The first paragraph of pre-AIA 35 U.S.C. § 112 required

a specification in a provisional disclosure to "contain a

written description of the invention, and of the manner and

process of making and using it, in such full, clear, concise,

and exact terms as to enable any person skilled in the art to

which it pertains . . . to make and use the same."  35 U.S.C. §

112 ¶ 1.  "Section 112 demands both (1) that a patentee

adequately disclose his or her invention to the public, and (2)

that the patent enable others to replicate it."  *In re*

*OxyContin Antitrust Litig.*, 994 F. Supp. 2d 367, 382 (S.D.N.Y.

2014), *aff'd sub nom. Purdue Pharma L.P. v. Epic Pharma, LLC*,

811 F.3d 1345 (Fed. Cir. 2016).  The written description

requirement and the enablement requirement are distinct, and a

patent or provisional application must satisfy both.  *Id.*

(citing *Ariad Pharm., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336,

1344 (Fed. Cir. 2010) (en banc)).

For a provisional application to establish priority,

"the specification of the *provisional* must 'contain a written

description of the invention and the manner and process of

making and using it, in such full, clear, concise, and exact

terms,' to enable an ordinarily skilled artisan to practice the

18

invention *claimed* in the *non-provisional* application." *Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*, 800 F.3d 1375, 1378 (Fed. Cir. 2015) (emphases in original) (internal quotation mark omitted) (quoting *New Railhead Mfg., L.L.C. v. Vermeer Mfg. Co.*, 298 F.3d 1290, 1294 (Fed. Cir. 2002)); *see also PowerOasis, Inc. v. T-Mobile USA, Inc.*, 522 F.3d 1299, 1306 (Fed. Cir. 2008) ("[A] patent application is entitled to the benefit of the filing date of an earlier filed application only if the disclosure of the earlier application provides support for the claims of the later application, as required by 35 U.S.C. § 112.").

### B. Enablement

The court will first consider enablement, the element of a priority determination that Whelan's Report clearly addresses. (*See* Rept. at 3 ("The scope of the assignment was to determine if the invention as described in the provisional patent application was sufficient to allow one to make the invention as claimed in [the] two issued patents . . . .").) Courts have interpreted § 112 to require that a provisional patent application "disclose enough detail to enable a person of ordinary skill in the art to practice the invention 'without undue experimentation.'" *In re OxyContin*, 944 F. Supp. 2d at 382. Some experimentation is permissible and may even be necessary, but "unduly extensive" experimentation will preclude

a finding of enablement. *Atlas Powder Co. v. E.I. Du Pont De Nemours & Co.*, 750 F.2d 1569, 1576 (Fed. Cir. 1984).

To determine if a disclosure requires undue experimentation, courts balance the so-called *Wands* factors, which include: (1) the quantity of experimentation necessary; (2) the amount of direction or guidance presented; (3) the presence or absence of working examples; (4) the nature of the invention; (5) the state of the prior art; (6) the relative skill of those in the art; (7) the predictability of the art; and (8) the breadth of the claims. *In re Wands*, 858 F.2d 731, 737 (Fed. Cir. 1988). These factors are "illustrative, not mandatory." *Streck, Inc. v. Research & Diagnostic Sys., Inc.*, 665 F.3d 1269, 1288 (Fed. Cir. 2012) (internal quotation mark omitted) (quoting *Amgen, Inc. v. Chugai Pharm. Co.*, 927 F.2d 1200, 1213 (Fed. Cir. 1991)). The Federal Circuit has explained that "[w]hether undue experimentation is needed is not a single, simple factual determination, but rather is a conclusion reached by weighing many factual considerations." *ALZA Corp. v. Andrx Pharm.*, 603 F.3d 935, 940 (Fed. Cir. 2010) (citing *In re Wands*, 858 F.2d at 737). Enablement does not require the disclosure "necessarily describe how to make and use every possible variant of the claimed invention," because a POSITA, through experimentation, "can often fill gaps, interpolate between embodiments, and perhaps even extrapolate beyond the disclosed

embodiments, depending upon the predictability of the art." *AK Steel Corp. v. Sollac & Ugine*, 344 F.3d 1234, 1244 (Fed. Cir. 2003); *see also Chiron Corp. v. Genentech, Inc.*, 363 F.3d 1247, 1253 (Fed. Cir. 2004).

The court precludes Whelan's opinion as to whether the '265 provisional enabled a POSITA to make the invention as claimed in the patents-in-suit because: (1) it will not assist the trier of fact; and (2) it is conclusory and thus unreliable. First, the Whelan Report does not actually appear to come to a clear enablement conclusion, and Whelan's underlying opinion will not help the jury "understand the evidence or determine a fact in issue." Fed. R. Evid. 702. Second, assuming Whelan opines on enablement, his opinion is conclusory and his method unclear because the Report is silent as to Whelan's method and experimentation.

First, Whelan does not expressly conclude that the description of the invention in the '265 provisional was sufficient to allow him to make the invention as claimed in the patents-in-suit. His conclusions only state that the provisional application and the patents-in-suit claimed common elements; that they included a similar advantage in the concave upper belt portion; and that, despite disclosing different methods to achieve this advantage, the '265 provisional models and the patents-in-suit models all performed similarly. (Rept.

at 25.)  Similar performance and common elements, however, are
not the standard for enablement, and a fact-finder will be left
to guess whether Whelan was, in fact, able "to make and use" the
claimed invention based on the '265 provisional disclosures.
Putting these conclusions before lay jurors would risk
misleading the jurors as to what constitutes enablement, an
impermissible risk under FRE 403.  Even ignoring this risk,
permitting Whelan to opine on this narrow conclusion that the
models he tested performed similarly to the patents-in-suit
would not "help the trier of fact to understand the evidence or
to determine a fact in issue" as required by FRE 702.  Similar
performance is not a proxy for enablement, and plaintiffs have
not identified other facts or issues that Whelan's opinion would
help determine.

Second, the court finds Whelan's method for testing
enablement is not reliable.  Even had Whelan clearly concluded
enablement, the Report does not indicate what steps he took, on
what ordinary skills in the art he relied, or what guidance he
took from the disclosures in the '265 provisional to make and
use the invention as claimed in the patents-in-suit.  Indeed, as
indicated in the Report, Whelan built the third, fourth, and
fifth models drawing directly from "what was claimed and
contained in the description[s]" of the patents-in-suit, and not
what was disclosed in the '265 provisional.  (*See, e.g.*, Rept.

at 14, 16, 18.)  It appears that Whelan's method amounted to
constructing models based on the specifications and claims in
the patents-in-suit, rather than making and using the claimed
invention from the '265 provisional's disclosures.  As discussed
above, Whelan's conclusions based on this method are not
probative of enablement.  Even assuming that Whelan had only
used the '265 provisional to build these models, his Report is
conclusory because it does not discuss his method for making the
claimed invention based on the disclosures in the '265
provisional.  He does not explain what experimentation was
necessary for a POSITA to "fill gaps," or "extrapolate beyond
the disclosed embodiments."  *AK Steel*, 344 F.3d at 1244.
Instead, he leaps from the '265 provisional models to those
based on the claims and descriptions in the patents-in-suit.

     Even though Whelan only had six days between the time
he was engaged by plaintiffs' counsel and the date of his
report, (*see* Rept. at 3), the court is left guessing as to how
much, if any, experimentation was necessary and whether it was
unduly extensive.[5]  This is especially true when considering the

---

[5]     The *Wands* factors are of course not mandatory, and Whelan's failure to
expressly address them in lock-step fashion does not render his enablement
opinion unreliable.  But, the factors nevertheless assist a fact-finder in
deciding if undue experimentation was necessary, and Whelan's reports do not
address these factors.  If Whelan determined no experimentation was
necessary, the report is silent as to that fact, and the court declines to
speculate.   Whelan's Report similarly includes no discussion of the state of
the prior art, the relative skill of those in the art, the predictability of
the art in general, or how any of these factors permitted him to make and use
the invention as claimed in the patents-in-suit.  Plaintiffs have not pointed

synchronous belt system which, unlike any of the other disclosed means-for-slackening, does not involve a structure that is in contact with the lower belt portion imparting an upward force. The Report does not explain how Whelan arrived at this structure or what in the disclosure of the '265 provisional enabled him to make and use it. Finally, Whelan goes so far as to distinguish the models based on the patents-in-suit as being "mechanical" without explaining why that distinction was or was not important.

The Report is thus conclusory because the court cannot determine that Whelan relied on methods and disclosures from the '265 provisional and then applied his technical expertise to the task before him. These analytical leaps render the Report's conclusion as to enablement unreliable. *Gen. Elec.*, 522 U.S. at 146 (holding a court may preclude opinion testimony with "too great an analytical gap between the data and the opinion proffered"). Therefore, his opinion as to enablement is precluded.

For the foregoing reasons, Whelan's opinion regarding enablement, as expressed in his opening Report is precluded and defendant's *Daubert* motion as to that opinion is granted. The

---

to deposition testimony from Whelan that might address this shortfall. Whelan's opinion as to these subjects would have been particularly helpful to the fact-finder in determining whether a POSITA could make and use the claimed invention from the disclosures of the '265 provisional without undue experimentation.

court need not consider whether Whelan's failure to identify or establish the POSITA is fatal to the admissibility of his opinion. The same applies to his alleged failure to address the written description requirement of § 112. The court reiterates, however, that the parties appear to agree that Whelan is a POSITA. Thus, had Whelan established that he could personally make and use the claimed inventions in the patents-in-suit using only the disclosures in the '265 provisional and without undue experimentation, plaintiffs arguably would have presented evidence probative of enablement. Further, because Whelan does not appear to be ultimately rendering an opinion as to priority the lack of a written description would not bear on the reliability of his enablement opinion.[6] Finally, the court need not address defendant's argument that Whelan's opinion conflicts with the court's later-issued claim construction order regarding the claim term "means-for-slackening."

### III.    Correction of Inventorship

Having precluded Whelan's opinion as to enablement, the court now turns to his Rebuttal report which counters Blair's opinion as to Oblamski's claim to inventorship of the patents-in-suit. Defendant argues that Whelan's opinion as to

---

[6]     Nor could Whelan or Blair render an opinion to an ultimate legal conclusion left to the court's determination. *See Hygh v. Jacobs*, 961 F.2d 359, 363 (2d Cir. 1992) ("This circuit is in accord with other circuits in requiring exclusion of expert testimony that expresses a legal conclusion.").

the proper inventorship of the patents-in-suit under 35 U.S.C. §

102(f) (2006) is based on insufficient facts or data and fails

to reliably apply sound methods to the facts of the case.  (Def.

Mem. at 24; Def. Reply at 8.)  Plaintiffs respond that defendant

has not pointed to what specific facts Whelan failed to consider

and why that failure affected his conclusions.  (Pl. Opp. at 20-

21.)

Section 102 "requires that a patent accurately name

the correct inventors of a claimed invention."[7]  *In re Verhoef*,

888 F.3d 1362, 1365 (Fed. Cir. 2018) (citing *Pannu v. Iolab

Corp.*, 155 F.3d 1344, 1349 (Fed. Cir. 1988)); *see also

Cumberland Pharm. Inc. v. Mylan Institutional LLC*, 846 F.3d

1213, 1217 (Fed. Cir. 2017) ("[A] derivation challenge invokes

the rule that an applicant is not entitled to a patent if 'he

did not himself invent the subject matter sought to be

patented.'" (quoting 35 U.S.C. § 102(f) (2006))).  A patent that

fails to accurately name an inventor is invalid.  *Pannu*, 155

F.3d at 1350.  Inventorship is a question of law that is

premised on underlying factual findings.  *Sewall v. Walters*, 21

F.3d 411, 415 (Fed. Cir. 1994).  Inventors named on an issued

patent are presumed to be correct, and one seeking to disturb

---

[7]    The AIA revised 35 U.S.C. § 102 and eliminated the derivation defense.
*Compare* 35 U.S.C. § 102 (2006) *with* 35 U.S.C. § 102 (2012).  As the patents-
in-suit issued prior to the effective date of the AIA, derivation ostensibly
remains an available invalidity defense to Woodway.

that presumption must meet the heavy burden of proving its case by clear and convincing evidence. *Cumberland Pharm.*, 846 F.3d at 1218. A challenger asserting derivation must show that there was a "prior conception of the claimed subject matter and communication of the conception" to the named inventor. *Price v. Symsek*, 988 F.2d 1187, 1190 (Fed. Cir. 1993).

Defendant argues that Whelan failed to consider clear and convincing evidence that Oblamski is at least a co-inventor of the patents-in-suit, and thus his Rebuttal rests on an unreliable foundation. (Def. Mem. at 25.) According to Woodway, this evidence includes deposition testimony, specifically Oblamski's, and other documents that defendant's expert, Dr. Blair, reviewed in forming his opinion on derivation. (*Id.*) According to defendant, Whelan only reviewed approximately ten documents hand-picked by plaintiffs' counsel and failed to interview either Astilean or Bostan, the named inventors. (*Id.*) Defendant also notes in its reply that it is not even clear that Whelan reviewed the relevant patent file histories. (Def. Reply at 8.) Plaintiffs appear to respond by arguing on the merits, pointing to the strength of Astilean's and Bostan's respective claims to inventorship. (Pl. Opp. at 21.)

The court is doubtful that either Blair or Whelan may render an opinion that would be helpful to the finder-of-fact

concerning the correct inventor of the patents-in-suit.  As an initial matter, courts must exclude expert testimony that expresses a legal conclusion.  *Hygh*, 961 F.2d at 363.  Both experts appear to render an ultimate conclusion as to Oblamski's claim of inventorship of the patents-in-suit.  (*See* Rebuttal at 13; Blair Rept. at 2-3, 36.)  Whelan, however, does not discuss the timing of either Oblamski's or Astilean's and Bostan's conception of the synchronized timing belt, and their corresponding communications of the same.  Expert testimony on conception and reduction to practice would be helpful by shedding light on when a prototype or other expressed concept could be fairly said to represent an inventor's claimed subject matter.

Whelan does not offer such testimony.  Both experts discuss a timeline of communications and collaboration between Astilean and Oblamski around late 2008 and early 2009, though Whelan does so with less specificity.  (Blair Rept. at 31-34, 36; Rebuttal at 13.)  Blair details communications between the relevant individuals and concludes that Astilean "was well aware of Mr. Oblamski's invention of a method of using a timing belt." (Blair Rept. at 36.)  Whelan highlights some of the same relevant events as Blair, but uses approximate dates and does not discuss when Astilean, Bostan, or Oblamski communicated to the others regarding a synchronous belt.  (*See* Rebuttal at 13.)

28

Whelan notes when Astilean and Oblamski began collaborating, and when Oblamski began working with suppliers on the Speedboard 2, the production model with a synchronous timing belt. (*Id.*)

Without much elaboration, Whelan concludes that "the file material does not suggest that Mr. Oblamski conceived or was developing a leg-powered treadmill with a lower belt portion taut and" concave upper belt portion prior to working with Astilean. (*Id.*) Even if this is true, it is not probative of whether Oblamski nevertheless conceived of and reduced to practice certain of the claimed structures in the patents-in-suit, namely those related to the use of a synchronous belt system. Without this discussion of conception and reduction, the Rebuttal is conclusory, and Whelan's ultimate conclusion that Oblamski "was neither the inventor or co-inventor of the leg-powered treadmill" is as unsupported and inadmissible as Blair's opposite conclusion.

Moreover, and like portions of Blair's report, the Rebuttal appears to express a legal conclusion. Legal conclusions will be excluded by this court. The fact-finder, whether a jury or the court, is empowered and perfectly capable of considering and making the necessary factual findings regarding the timing of communications between the named co-inventors and the alleged would-be inventor. The remainder of Whelan's opinions expressed in his Rebuttal are unchallenged,

and the court shall not consider their admissibility prior to
trial.  For the same reasons, Blair's conclusions that the
Astilean patents are invalid, or that Oblamski is an inventor or
co-inventor of certain subject matter of the patents-in-suit,
are likewise precluded

**CONCLUSION**

For the reasons discussed above, defendant's motion is
GRANTED as follows.  Whelan's opinion as to enablement as
expressed in the Report is precluded.  His and Blair's opinions
as to derivation and Oblamski's status as an inventor of the
patents-in-suit is likewise precluded.  Having resolved the
parties' expert evidentiary disputes, the parties are ordered to
confer and schedule a conference to update the court as to the
prospect for settlement of this matter, or to discuss
dispositive motion practice or setting a trial date.

**SO ORDERED.**

Dated: Brooklyn, New York
       March 29, 2019

_____/s/_____
**KIYO A. MATSUMOTO**
United States District Judge
Eastern District of New York