UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------X

SPEEDFIT LLC and AUREL A.
ASTILEAN,

     *Plaintiffs*,

    -against-

WOODWAY USA, INC.,

     *Defendant*.

---------------------------------X

**MEMORANDUM & ORDER**
13-CV-1276 (KAM)(AKT)

**MATSUMOTO, United States District Judge:**

     Before the court are cross-motions for summary judgment by plaintiffs Speedfit LLC ("Speedfit") and Aurel A. Astilean ("Astilean") (collectively, "plaintiffs"), and defendant Woodway USA, Inc. ("Woodway" or "defendant"). Plaintiffs allege Woodway infringed two Speedfit patents relating to a curved, non-motorized treadmill involving a closed-loop treadmill belt designed to maintain a concave running surface and taut lower portion. (ECF No. 150, Supplemental Complaint ("Supp. Compl.") ¶¶ 18-21.)[1]

---

[1]    The parties served their opening briefs on June 28, 2019, (ECF No. 268-1, Plaintiffs' Memorandum of Law in Support of Plaintiffs' Motion for Summary Judgment ("Pls.' Mot."); ECF No. 279-1, Defendant's Memorandum of Law in Support of its Motion for Summary Judgment ("Def.'s Mot.")); their opposition briefs on July 17, 2019, (ECF No. 280, Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment ("Pls.' Opp."); ECF No. 277, Defendant's Memorandum of Law in Opposition to Plaintiffs' Motion for Summary Judgment ("Def.'s Opp.")); and their replies on August 9, 2019, (ECF No. 278, Memorandum of Law in Reply to Defendant's Answer ("Pls.' Reply"); ECF No. 281, Defendant's Reply Memorandum of Law ("Def.'s Reply")). The parties also submitted a joint Local Civil Rule 56.1 Statement. (ECF No. 283.) The captions "JSOF (WW) ¶ _" and "JSOF (Sp.) ¶ _" are used in this Memorandum & Order to denote undisputed facts asserted by defendant and plaintiffs,

**I.  Statement of Facts**

   **A.   Astilean's Collaboration with Woodway**

       In late 2008, Astilean was regularly communicating

with Woodway and its personnel about development of a curved,

non-motorized treadmill.  On December 11, 2008, Eric Weber,

Woodway's Director of Sales and Marketing, arranged for delivery

of "1 mercury belt[,] 2 complete bearing rails[,] 2 foot fall

strips . . . [,] and 20 self tapping screws" to Astilean, and

directed Nicholas Oblamski, Woodway's Senior Project Engineer,

to "add this to the list of moneys Alex [Astilean] owes us."

(ECF No. 268-16, Declaration of John F. Vodopia ("Vodopia

Decl."), Ex. PL4.)

       Four days later, Astilean emailed Oblamski to ask if

he "got the new part," (ECF No. 268-17, Vodopia Decl., Ex. PL5),

a reference to wooden bearing rails for a wooden prototype of

the curved, non-motorized treadmill ("Wooden Prototype").  (ECF

No. 283-1, Joint Deposition Testimony Appendix ("JDTA"), 0920:2-

19 (Oblamski Dep.).)  Oblamski confirmed receipt, and the next

day, asked Astilean to provide pictures or a video of the

treadmill so that Oblamski could "have a better understanding of

---

respectively.  The captions "WW SOF ¶ _" and "Sp. SOF ¶ _" refer to
statements of fact by defendant and plaintiffs, respectively, that are
disputed.

how it mounts and how the system works[.]" (Vodopia Decl., Ex. PL5.) Moments later, Oblamski asked Douglas Bayerlein, Woodway's president, and others at Woodway, "[w]hat's the news? Do I get out my skill saw? Alex is wondering when he gets it back and he wants to talk to Eric [Weber] or Doug [Bayerlein]." (ECF No. 268-18, Vodopia Decl., Ex. PL6.) Oblamski's email attached photographs of a treadmill with a curved surface and wooden side panels, stationed in an outdoor yard. (*Id.*) On December 17, 2008, Oblamski sent an internal email to Woodway personnel about a "[n]ew project." (ECF No. 268-19, Vodopia Decl., Ex. PL7.) Oblamski's email listed a number of bullet point items, the last of which read "3 treadmills by IHRSA [*i.e.*, the International Health, Racquet & Sportsclub Association tradeshow], 1 for the show, 1 or 2 for Alex." (*Id.*)

Astilean and Oblamski continued their correspondence through the end of 2008, into January 2009. Oblamski asked Astilean about the treadmill's specifications, (ECF No. 268-20, Vodopia Decl., Ex. PL8 (email dated 12/18/2008) ("What is the point of having a groove in the wood on each end?[;] Why are there bearings missing?")), and Astilean provided answers. (*Id.* ("Yes the right side is the front is the one which is not curb anymore at the end, the bearing missing not important, the groove was for testing different height of the axle not important anymore[.]").) Oblamski used Astilean's input to

3

generate computer models of the treadmill or its components. (ECF No. 268-21, Vodopia Decl., Ex. PL9 (email dated 12/18/2008) ("So I measured your bearing rails and came up with a curve on my computer. Everything is on a perfect circle except for the far point on the right, see the picture I've attached called 'curve.'").

In January 2009, the Discovery Channel featured Astilean's Wooden Prototype on a recreational television show. (WW SOF ¶ 121; JDTA0509:17-21 ("**Q.** Which curved treadmill was shown in that Discovery Channel episode? **A.** The prototype. **Q.** Which prototype? **A.** The wood prototype.").)[2] On January 4, after Astilean told Woodway about his Discovery Channel appearance, Oblamski emailed Eric Weber and Doug Bayerlein to ask which prototype of the treadmill would be presented at the IHRSA tradeshow: the Wooden Prototype that Astilean and Speedfit shared with the Discovery Channel, or "the one we make." (ECF No. 268-22, Vodopia Decl., Ex. PL10.) Oblamski suggested that if Astilean "knows this one [*i.e.*, the Wooden Protoype] will work, we should bring this one," and reiterated the original question, "[d]o we use his for the show, or do we still push ours through quick and get our version to the show?" (*Id.*)

---

[2]     Though the parties do not classify this fact as undisputed, plaintiffs did not respond to it, so the court will deem it admitted. *Giannullo v. City of New York*, 322 F.3d 139, 140 (2d Cir. 2003).

Weber responded that, whatever the decision, Woodway had to "answer a few questions prior to the show," including, "[h]ow much are we charging Alex for this []or how much will he make on each one [*i.e.*, treadmill] . . . ." (*Id.*)

On January 21, 2009, Astilean sent Oblamski, Bayerlein, and Weber a design for the "new SpeedBoard," and asked Oblamski to put it on CAD, Woodway's computer aided design program, to "see how it will look." (ECF No. 268-23, Vodopia Decl., Ex. PL11.) Astilean told Oblamski that Woodway would have to resolve the problem of "the belt rolling under," but Astilean indicated that he would send along pictures to show Oblamski "how [Astilean] did it." (*Id.*) Five days later, Oblamski sent along a computer-generated image of the treadmill model but suggested that the dimensions of the treadmill belt had to be changed to avoid applying too much stress to the front and rear of the structure. (*Id.*) With respect to the treadmill's dimensions, Oblamski asked Astilean to "either approve the side cover shape or get me a new side cover shape you'd like to use" so that Oblamski could finalize preparations for the IHRSA tradeshow. (*Id.*)

On February 25, Astilean reached out to Oblamski to ask how the development of the treadmill was coming along. (ECF No. 268-24, Vodopia Decl., Ex. PL12.) Oblamski assured Astilean

that "[e]verything for the speedboard is coming along as planned." Oblamski continued:

> You can see the long belt which synchronizes the front and rear shafts and works great. I will put the running belt on tomorrow and see what happens, hopefully it will just work as planned but I'm thinking we'll need to make some adjustments.

(*Id.*) Three days later, Oblamski informed Astilean that, while working on the treadmill model, he "finally came up with a good solution" to keep the treadmill belt in position. (ECF No. 268-25, Vodopia Decl., Ex. PL13.) Oblamski still wanted to "try a few different things, like adjusting the tension on the belt," and would try to "improve it some more this coming week before we have to ship it to the show." (*Id.*)

## B.    The 2009 Introduction of the Speedboard 2/Curve

On or around March 17, 2009, Woodway publicly introduced, and offered for sale, the Speedboard 2/Curve—a curved, non-motorized treadmill—at the IHRSA tradeshow. (JSOF (WW) ¶ 40; JSOF (Sp.) ¶ 17.)[3] Astilean attended the IHRSA tradeshow and worked in Woodway's booth to help "generate buzz"

---

[3]    It appears the treadmill displayed at the IHRSA show was initially sold and promoted by Woodway as the "Speedboard 2.0," until Woodway changed the name to Curve sometime after the summer of 2009. (JDTA0855:8-19; JDTA0763:7-20; JDTA2620:3-2621:13; JDTA0898:25-0900:14; *see also* JSOF (Sp.) ¶ 18.) Woodway's trademark application for "Curve," filed March 16, 2009, indicates that Woodway first used "Curve" on the treadmill in January 2010, after defendant removed the name Speedboard from the models it sold in 2009. (JSOF (Sp.) ¶ 18.) The parties agree that the treadmill introduced at IHRSA is one form of the allegedly infringing "Legacy Manual Treadmills," (hereinafter "Legacy Treadmills"). (*See* JSOF (WW) ¶ 40.)

and sell as many treadmills as possible.  (JSOF (WW) ¶¶ 41-42.)
The parties do not dispute that the curved, non-motorized
treadmill displayed at IHRSA in 2009 was on sale prior to
October 29 and November 1, 2009.  (JSOF (WW) ¶ 47.)  According
to Astilean, following the curved manual treadmill's "instant
success" at IHRSA, the treadmills began to sell at health and
fitness clubs in the Unites States during the summer of 2009.
(JSOF (WW) ¶¶ 43-45.)

On March 17, 2009, Woodway's counsel filed U.S.
Provisional Application, serial no. 61/161,027, on behalf of
applicant Nicholas Oblamski ("Oblamski Provisional").  (*See* ECF
No. 268-29, Vodopia Decl., Ex. PL17.)  The Oblamski Provisional
disclosed a curved treadmill that "can use a main pulley system
and a secondary pulley system on either end to control a main
belt and a synchronous belt for a safe and comfortable curved
running surface."  (Oblamski Provisional 1 (Summary [0002]).)[4]
Not long after Woodway filed the Oblamski Provisional, Astilean
sent an email to Doug Bayerlein, among others, expressing his
concern about recent developments regarding the intellectual
property rights to the curved, non-motorized treadmills.  (ECF

---

[4]    As background for Oblamski's purported invention, the provisional
application explains that, in conventional treadmills, "[t]he belt can
eventually cause slippage and tracking problems and wear to both
belt and deck," and that the need to keep the belt taut at all times causes
wear to the bearings at the front and rear of the treadmill.  (*Id.* 1
(Background [0001]).)

No. 268-30, Vodopia Decl., Ex. PL18 (email dated 4/7/2009).)
Astilean was concerned that Woodway removed Astilean's name from
the "SpeedFit Speedboard prototype curved treadmill" and was
showcasing the product without Speedfit's name attached. (*Id.*)
Astilean declared that Speedfit owned the prototype and design
of the curved, non-motorized treadmill, and requested that
Woodway immediately stop showcasing the prototype without proper
attribution to Speedfit. (*Id.*) Astilean closed the email by
expressing interest in a future business relationship,
contingent on Woodway ceasing its unauthorized use of the
treadmill prototype, and urged Bayerlein to contact Astilean's
counsel to "discuss a possible licensing arrangement[][.]"
(*Id.*)

Bayerlein responded later in the day. He reassured
Astilean that the Speedfit name was still being used on
Woodway's website, and that the only reason Astilean's name was
not being associated with the product was because the name of
the designer was not important to potential customers of the
curved, non-motorized treadmill. (*Id.*) Bayerlein seemingly
offered to attribute the design to Astilean, but first demanded
that Astilean explain "what you feel is patentable or what you
indeed did design," because, in Bayerlein's view, the curved
treadmill was prior art and therefore, not patentable. (*Id.*)
Bayerlein concluded by insisting that he wanted to work with

Astilean but had to know "what it is that you feel you can obtain a patent on and how we (Woodway) would be protected on that patent." (*Id.*)

### C. The '265 Provisional Application

On November 2, 2009, Astilean's representatives filed U.S. Provisional Patent Application No. 61/280,265 ("'265 Provisional"). (ECF No. 271-5, Declaration of Kadie M. Jelenchick ("Jelenchick Decl."), Ex. E.) The '265 Provisional is five paragraphs long and features the following, single visual illustration of the Wooden Prototype:



*Fig. 1*

(*See generally* '265 Provisional.)

As an initial matter, the '265 Provisional instructs that "[t]he description of the invention which follows, together with the accompanying drawing should not be construed as limiting the invention to the example shown and described, because those skilled in the art to which this invention appertains will be able to devise other forms thereof." ('265 Provisional (Brief Description of Several Views of the Drawing).)

The '265 Provisional discloses that "[s]prings (not shown) exert spring urgency in opposite directions" to hold taut the length of the lower belt. ('265 Provisional; *see also* JDTA 1857:21-1858:1 (Bostan Dep.) (testifying that Astilean came up with springs referenced in provisional application as a solution to maintain curvature of running belt).) The '265 Provisional also states that the "inability to maintain the concave shape" of the treadmill "is overcome by the weight 30 which in practice has been found to hold the concave shape 34 during the uphill running of the exercise 36." ('265 Provisional.) The '265 Provisional did not disclose literally, or visually, a timing belt, timing belt pulleys, timing belt idlers, or the concept of synchronous motion. (JSOF (WW) ¶ 28.)

**D.    The Patents-in-Suit**

U.S. Patent No. 8,308,619 ("'619 Patent"), entitled "Leg-Powered Treadmill," was filed on October 29, 2010, and issued to Astilean on November 13, 2012. (ECF No. 271, Jelenchick Decl., Ex. B; JSOF (WW) ¶¶ 1-2.)  The '619 Patent claims priority under 35 U.S.C. § 119(e) to the '265 Provisional, and *ipso facto*, asserts November 2, 2009 as its priority date.  (JSOF (WW) ¶¶ 3-4; '619 Patent, col. 1, lines 5-8; ECF No. 271-7, Jelenchick Decl., Ex. G ("Pls.' 2nd Supp. Ans. to Def.'s 1st Set of Ints."), 4.)  U.S. Patent No. 8,343,016 ("'016 Patent," and with '619 Patent, "Patents-in-suit"), also entitled "Leg-Powered Treadmill," was filed on November 1, 2010, and issued on January 1, 2013 to Astilean.  (JSOF (WW) ¶¶ 7-8; ECF No. 271-4, Jelenchick Decl., Ex. D.)  Like the '619 Patent, the '016 Patent asserts November 2, 2009 as its priority date, based on the '265 Provisional.  (JSOF (WW) ¶ 9; '016 Patent, col. 1, lines 5-8; Pls.' 2nd Supp. Ans. to Def.'s 1st Set of Rogs, 6.)  The '619 Patent ultimately issued with a single independent claim (Claim 1).  (JSOF (WW) ¶ 10.)  The '016 Patent, a continuation-in-part of the '619 Patent application, issued with 17 claims, only one of which is independent (Claim 1).  (JSOF (WW) ¶ 12.)

The '619 Patent relates to "a motor-less leg-powered curved treadmill." ('619 Patent, col. 1, lines 44-45.)[5] Claim 1 of the '619 Patent discloses the following limitations: (1) "said parallel slats attached to each other in a resilient fashion"; (2) "a timing belt having respective timing belt pulleys attached to said front and rear pulley rollers for said closed loop treadmill belt"; (3) "wherein timing belt idlers are used to configure said timing belt geometrically to fit within constraints of side contours of said treadmill"; and (4) "said timing belt will not permit drooping down of said lower taut portion of said closed loop treadmill belt because all respective motion is synchronous." (JSOF (WW) ¶ 17; '619 Patent, col. 4, lines 61-62; col. 5, lines 10-11 to col. 6, line 19; col. 6, lines 1-4; col. 6, lines 6-9.) The '619 Patent application describes a timing belt, timing belt pulleys, timing belt idlers, or the concept of synchronous motion as an

---

[5] The '619 Patent's "Summary of the Invention" provides as follows:

The present invention is a motor-less leg-powered curved treadmill produced wherein the curved, low friction surface allows people to walk, jog, run, and sprint without making any adjustments to the treadmill other than shifting the user's center of gravity forward and backwards. This novel speed control due to the curve allows people of any weight and size to adjust their own speed in fractions of a second. The user controls the speed by positioning their body along the curved running surface. Stepping forward initiates movement, as the user propels themselves up the curve the speed increases. To slow down, the user simply drifts back towards the rear curve. . . . This unique design of the curve in a low friction surface allows any user, regardless of weight and size, to find and maintain the speed they desire.

('619 Patent, col. 1, lines 44-63.)

alternative to the use of springs as described in the '265
Provisional.  (JSOF (WW) ¶ 33; Jelenchick Decl., Ex. A ("”619
Application"), 3, 6, Fig. 3.)

Claim 1 of '016 Patent specifies the following
limitation for a "motor-less, leg-powered curved treadmill":
"wherein each said slat . . . conform[s] to a concave row of
upper support peripheral ball bearings located at each
peripheral side of said upper portion of said motor-less, leg-
powered curved treadmill."  (JSOF (WW) ¶ 19; '016 Patent, col.
6, lines 48-52.)  Claim 1 of the '016 Patent also claims "a
means for slackening an upper concave portion while
simultaneously keeping a lower portion of the belt taut,
preventing said lower portion from drooping down during rotation
and exertion of walking or running force upon said upper concave
portion of said closed loop treadmill belt." (JSOF (WW) ¶ 21;
'016 Patent, col. 6, lines 30-52.)  Figure 2 of the '016 Patent
discloses the following illustration:



('016 Patent (Sheet 4 of 8).)  Figure 3 of the '016 Patent

discloses the following illustration:



(*Id.*)  And Figure 4 of the '016 Patent discloses the following

illustration:



Though the '619 and '016 Patents both claim the

benefit under 35 U.S.C. § 119(e) of the '265 Provisional and its

November 2, 2009 filing date, (JSOF (WW) ¶¶ 3, 4, 9; ECF No.

271-13, Jelenchick Decl., Ex. M (file history of '619 Patent),

33, 48; ECF No. 271-14, Jelenchick Decl., Ex. N (file history of

'016 Patent), 10, 32; Pls.' 2nd Supp. Ans. to Def.'s 1st Set of

Ints., 4, 6), neither Patents' file history explicitly states

that the Patent and Trademark Office ("PTO") made a priority

determination with respect to the Patents-in-suit.  (*See generally* Jelenchick Decl., Exs. M, N; *see also* WW SOF ¶ 24.)

## II.  Procedural History

### A.  The Supplemental Complaint

Plaintiffs commenced this action on March 11, 2013. (*See* ECF No. 1.)  On December 28, 2016, after multiple amendments to the complaint and substantial motion practice, the court granted defendant's motion to dismiss plaintiffs' infringement claims asserted in the Third Amended Complaint ("TAC").  (ECF No. 143, MTD Order.)  The dismissal of plaintiffs' infringement claims was principally based on plaintiffs' failure to demonstrate their standing to assert infringement of the Patents-in-suit without joining the curved, non-motorized treadmill's purported co-inventor, Daniel Bostan. (MTD Order 11.)

Thereafter, on February 10, 2017, plaintiffs filed the fourth iteration of their complaint against defendant Woodway. (ECF No. 150, Supplemental Complaint ("Supp. Compl.").)  The Supplemental Complaint circumvents the standing bar discussed in the MTD Order by asserting infringement as of June 1, 2015, the date that Bostan and Astilean assigned their rights, title and

interest in the '619 and '016 Patents to Speedfit.[6] (*See* Supp.
Compl. ¶¶ 11-13; *see also* ECF No. 268-2, Vodopia Decl., Ex.
PL30.)

The Supplemental Complaint claims that Woodway
infringed the Patents-in-suit. (Supp. Compl. ¶¶ 11, 12, 57-66.)
Plaintiffs allege that Astilean disclosed the Wooden Prototype
to Woodway in December 2008, one month after Astilean filed the
'239 Provisional Application to protect the invention.[7] (*Id.* ¶¶
40-41.) After meeting with Bayerlein to discuss the treadmill
prototype, Astilean worked with Oblamski to build a model of the
treadmill for the IHRSA tradeshow. (*Id.* ¶¶ 19, 41.) The
Supplemental Complaint alleges that even though Woodway did not
commit to a specific compensation for Speedfit or Astilean,
"both Astilean and Bayerlein understood that Speedfit would be
compensated" for plaintiffs' work in connection with the
tradeshow model. (*Id.* ¶ 41.) Plaintiffs allege that Woodway
subsequently misappropriated their unique concept, design, and

---

[6]     During a telephonic status conference held before this court on January
19, 2017, plaintiffs proposed filing a fourth amended complaint alleging
infringement claims on behalf of Speedfit as of June 1, 2015. (*See* ECF
Minute entry dated 1/19/2017.) Defendant expressed a preference that
plaintiffs file a supplemental complaint to avoid relation back issues, to
which plaintiffs consented, and plaintiffs subsequently filed the
Supplemental Complaint on February 10, 2017. (*See id.;* Supp. Compl.)

[7]     The '239 Provisional was initially filed on November 7, 2008, but was
superseded by the '265 Provisional filed on November 2, 2009. (*Id.* ¶ 40.)

16

patent rights, by filing the Oblamski Provisional in Oblamski's name, to the exclusion of Speedfit and Astilean. (*Id.* ¶ 2.)

The Supplemental Complaint also asserts claims for breach of contract, unjust enrichment, and constructive trust. The breach of contract claim is premised on two written non-disclosure agreements ("NDAs") that Astilean claims to have entered into with Bayerlein, in 2003 and 2005, respectively, as well as a purported oral confidentiality agreement. (Supp. Compl. ¶ 25 ("On or about May 1, 2003, after a meeting between Astilean and Bayerlein at the Hilton Hotel in New York City, the parties entered into a [NDA] and duly executed a writing embodying the terms of the [NDA]."); *id.* ¶ 27 ("In May 2005, . . . the parties entered into a second nondisclosure/circumvention agreement and signed a writing embodying the terms of the second [NDA] which were orally conveyed to Plaintiffs."); *id.* ¶ 69.) According to plaintiffs, defendant breached "these agreements" by selling the curved, non-motorized treadmills, and by filing the Oblamski Provisional, which identified Oblamski as the sole inventor of the treadmills and did not mention plaintiffs. (*Id.* ¶ 70.)

The Supplemental Complaint further alleges that Woodway was unjustly enriched by income received from sales of the curved, non-motorized treadmill. (*Id.* ¶ 7, 72-74.) In

addition, plaintiffs assert Woodway's income from the infringing treadmill's sales should be segregated in a constructive trust in Speedfit's name because Woodway's actions were an abuse of the confidential and fiduciary relationship that allegedly existed between plaintiffs and defendant. (*Id.* ¶¶ 7, 75-81.)

### B.    Claim Construction

On August 15, 2017, the court held a *Markman* hearing, and subsequently issued an order, dated November 20, 2017, concerning the appropriate claim construction for "means for slackening," recited in Claim 1 of the '016 Patent. (ECF No. 189, Claim Constr. Order.) The parties stipulated that "means for slackening" should be construed as a means-plus-function limitation, and the claimed function construed as slackening the upper concave or curved portion of the treadmill belt, while simultaneously keeping the lower portion taut. (Claim Constr. Order 16.)

The court construed Claim 1 of the '016 Patent "as limited to the structures specifically described in the specification, *i.e.*, those disclosed in Figures 2, 3, and 4, and their equivalents." (*Id.* 17-18.) In doing so, the court rejected plaintiffs' proposed broadening of the term to include "any disclosed species and equivalents thereof, that function to keep the lower part of the belt from drooping and/or the upper

part of the belt slack." (*Id.* 19.)  Notably, the court observed that the '265 Provisional did "not disclose the specific structure intended to perform the slackening function." (*Id.* 20.)  The Claim Construction Order nevertheless clarified that the construed "means for slackening" limitation still "protect[ed] any structure deemed to be an 'equivalent,' . . . a question of fact to be addressed at the infringement stage following claim construction." (*Id.* 21.)

### C.  Plaintiffs' Expert

On March 29, 2019, the court decided two *Daubert* motions, only one of which is pertinent here.  Woodway moved to preclude testimony offered by James Whelan, plaintiffs' technical expert, concerning the '265 Provisional, (ECF No. 211), and the court granted defendant's motion, (ECF No. 241, Whelan Order).

Whelan's report, dated July 27, 2015, addressed whether "the invention as described in the ['265] provisional patent application was sufficient to allow one to make the invention as claimed in [the Patents-in-suit]." (ECF No. 212-1, Expert Report of James Whelan ("Whelan Rept."), 3.)  The parties' *Daubert* motion papers disputed the purpose of the Whelan Report.  According to defendant, plaintiffs were trying to support their claim that the Patents-in-suit were entitled to

the '265 Provisional's priority filing date under 35 U.S.C. §
119.[8] (Whelan Order 14-15.) Plaintiffs countered that the PTO
already determined priority when it granted the Patents, but
conceded that the IHRSA tradeshow disclosure of the
Speedboard2/Curve could constitute disclosure of prior art if
not for the '265 Provisional's priority filing date. (*Id.* 15.)
The Whelan Report concluded that: (1) the '265 Provisional and
the Patents-in-suit "claimed common elements;" (2) the '265
Provisional disclosed "different methods for keeping the
[treadmill's] lower belt portion taut" than the Patents-in-suit
did; and (3) the different methods claimed in the Patents-in-
suit "were mechanical and performed similar[ly] as to the method
disclosed in the ['265 provisional]." (*Id.* 21 (brackets in
original).)

    Though the court found Whelan qualified as a relevant
person of ordinary skill in the art ("POSITA"), his opinion that
the disclosures in the '265 Provisional and Patents-in-suit had
common elements and performed similarly did not satisfy the
standard for enablement under 35 U.S.C. § 112, was considered
conclusory and unreliable, and thus precluded. (*Id.* 13-14, 21-

---

[8]    As noted above, the Patents-in-suit were filed on October 29 and
November 1, 2010, respectively. As discussed in greater detail below, sales
of the allegedly infringing treadmill more than a year before the Patents'
filing dates could constitute invalidating prior art unless the Patents-in-
suit are entitled to priority dating to the earlier filing date for the '265
Provisional, November 2, 2009. *See* 35 U.S.C. §§ 102(a)-(b) (2000).

22.)  Critically, although Whelan determined that the '265

Provisional and Patents-in-suit claimed common elements and

shared a similar advantage in the concave upper belt portion,

albeit by using different methods to achieve that advantage,

Whelan did not expressly conclude that the description of the

invention in the '265 Provisional was sufficient to allow him to

make the invention as claimed in the Patents-in-suit.  (*Id.* 21.)[9]

## III.   **The Parties' Motions**

Defendant's core contention is that the Patents-in-

suit are invalid.  Specifically, the public disclosure and sale

of the Speedboard 2/Curve beginning in March 2009, at the IHRSA

tradeshow, more than a year before the Patents-in-suit were

filed, triggered the "on-sale" bar set forth by 35 U.S.C. §

102(b).  (Def.'s Mot. 1).  Defendant asserts that plaintiffs

cannot overcome this invalidity challenge by claiming priority

---

[9]     Whelan also completed a Rebuttal report ("Rebuttal"), and on August 26,
2015, plaintiffs served this Rebuttal on defendant.  (*See* ECF No. 212-2,
Whelan Rebuttal Report ("Whelan Rebuttal").)  Among other contentions,
Whelan's Rebuttal specifically responded to the report of defendant's
technical expert, Dr. Kim Blair, which concluded, *inter alia*, that the
Patents-in-suit are invalid as anticipated.  (*Id.* at 12; *see also* ECF No.
214, Report of Dr. Kim Blair ("Blair Rept."), 2, 32, 35-37.)  Dr. Blair's
report further concluded that Nicholas Oblamski, Woodway's engineer, "is an
inventor of certain of the subject matter of the [patents-in-suit]" and that
"clear and convincing evidence" establishes that Oblamski "conceived of and
reduced to practice a synchronous belt" system without any contribution from
Astilean or Bostan.  (Whelan Rebuttal 12; Blair Rept. 3, 33.)  The court
precluded Whelan and Blair's opinions as to derivation and Oblamski's status
as an inventor of the Patents-in-suit.  (Whelan Order 30.)

under the '265 Provisional, which was filed on November 2, 2009, less than a year after sales of the Speedboard 2/Curve began, because the '265 Provisional did not contain a sufficient written description of the claims and limitations ultimately disclosed by the '619 and '016 Patents.  (*Id.*)

In the alternative, defendant contends summary judgment is at least warranted for plaintiffs' infringement claims directed at Woodway's current line of curved, manual treadmills ("Current Treadmills"), which defendant insists are distinct from the Legacy Treadmills, or "Curve Products," that are the subject of the Supplemental Complaint's infringement allegations.  (Def.'s Mot. 1-2; *see also* JSOF (WW) ¶ 59; Supp. Compl. ¶ 62 ("Defendant has infringed . . . by making, selling, and using the Curve Products . . . .").)  Woodway began to phase out the Curve Products in February 2016, (JSOF (WW) ¶ 61), and the Current Treadmills do not literally meet the "means for slackening" limitation in the '016 and '619 Patents.  (Def.'s Mot. 2.)

Defendant further points out that plaintiffs have failed to produce the written agreements underlying their breach of contract claim, warranting dismissal.  (Def.'s Mot. 23; WW SOF ¶¶ 82, 83.)  Defendant also argues that any purported oral agreement violates the Statute of Frauds by creating obligations

that cannot be performed within one year, and also fails for indefiniteness.  (Def.'s Mot. 24-28.)  Defendant contends that plaintiffs other state law claims for unjust enrichment and constructive trust are merely repurposed breach of contract claims, and that plaintiffs have failed to show the existence of a confidential or fiduciary relationship that would support imposition of a constructive trust.  (*Id.* 2.)

Plaintiffs cross-move for summary judgment on two grounds.  First, plaintiffs assert that the court should exercise its "broad if not infinite discretion" to hold defendant liable for unjust enrichment.  (Pls.' Mot. 12.) Plaintiffs aver that liability and damages for unjust enrichment are foregone conclusions based, *inter alia*, on what plaintiffs describe as defendant's "tortious conduct, which includes theft, bad faith, fraud and deceit."  (*Id.* 12-17.)  Regarding plaintiffs' infringement claims, plaintiffs assert no trial is necessary to establish that the Curve products—the Speedboard 2/Curve, the Curve XL, the Curve 3, and the Ecomil—include "each and every element" of the independent claims in the Patents-in-suit.  (*Id.* 17.)  Plaintiffs initially construe "means for slackening" as "any structure that prevents the upper portion of the closed loop treadmill belt from floating up between the end rollers, found in the patent and file history, and equivalents thereof, as understood by one of ordinary skill in the art,"

without reference to the court's Claim Construction Order. (*Id.* 18.)  Plaintiffs then argue, relying on an attorney-generated flowchart, that each of the claimed elements in Claim 1 of the '016 and '619 Patents are found in the Woodway Legacy Treadmills, leading to the inexorable conclusion that the elements of the Legacy Treadmills are "equivalent" to Claim 1 of the respective Patents-in-suit. (*Id.* 19-25.)

### LEGAL STANDARD FOR SUMMARY JUDGMENT

"The court applies the same summary judgment standards to patent infringement matters as it does to motions involving other types of claims." *Mich & Mich. TGR, Inc. v. Brazabra, Corp.*, 128 F. Supp. 3d 621, 629 (E.D.N.Y. 2015), *aff'd sub nom. Mich & Mich TGR, Inc. v. Brazabra Corp.*, 657 F. App'x 971 (Fed. Cir. 2016) (citations omitted).  "When deciding issues in a patent case, a district court applies the law of the circuit in which it sits to nonpatent issues and the law of the Federal Circuit to issues of substantive patent law," *id.* at 631 (citations omitted), as well as to procedural issues that are "intimately involved in the substance of enforcement of the patent right." *Id.* (quoting *Advanced Cardiovascular Sys., Inc. v. Medtronic, Inc.*, 265 F.3d 1294, 1303 (Fed. Cir. 2001)).

Summary judgment is appropriate only where "the pleadings, depositions, answers to interrogatories, and

admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Lowe v. City of Shelton*, 128 F. App'x 813, 814 (2d Cir. 2005) (citing Fed. R. Civ. P. 56(c)). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). For summary judgment purposes, a fact is material if it "might affect the outcome of the suit under the governing law," and a dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248; *accord Mich & Mich. TGR*, 128 F. Supp. 3d at 629 (citations omitted). Additionally, no genuine issue of material fact exists "unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted); *accord Mich & Mich. TGR*, 128 F. Supp. 3d at 629 (citation omitted).

In ruling on a motion for summary judgment, the court's function is only to "determine whether there is a

genuine issue for trial," not to "weigh the evidence and determine the truth of the matter." *Anderson*, 477 U.S. at 249. Further, the court must "view the evidence presented in a light most favorable to the nonmoving party and . . . draw all reasonable inferences in favor of the nonmoving party." *Mich & Mich. TGR*, 128 F. Supp. 3d at 630 (quoting *CA, Inc. v. Simple.com, Inc.*, 780 F. Supp. 2d 196, 209 (E.D.N.Y. 2009)) (omission in quoted material). "The movant has the burden of showing that there is no genuine issue of [material] fact." *Anderson*, 477 U.S. at 256. The nonmoving party "need only present evidence from which a jury might return a verdict in his favor" to defeat a motion for summary judgment, *id.* at 257, though making such a showing requires "specific facts showing that there is a *genuine issue for trial*," not merely "that there is some metaphysical doubt as to the material facts." *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (emphasis in original) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)).

The nonmoving party may not rest only on the pleadings, and "[e]ach statement of material fact by the movant or opponent must be followed by citation to evidence which would be admissible, as required by [Rule] 56(e) and Local Civil Rule 56.1(d)." *Mich & Mich. TGR*, 128 F. Supp. 3d at 630 (citations omitted). Local Civil Rule 56.1 provides that the party

opposing a summary judgment motion "shall include a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party."  Local Civ. R. 56.1(b).  "If the opposing party fails to controvert a fact so set forth in the moving party's Rule 56.1 statement," or does so in a manner that does not comply with Local Rule 56.1(b)-(d), "that fact will be deemed admitted."  *Giannullo*, 322 F.3d at 140.

## DISCUSSION

### I.   Patent Infringement

#### A.    Validity of Patents-in-Suit

Defendant moves for summary judgment against plaintiffs' patent infringement claim on the grounds that the underlying Patents-in-suit are invalid.  For the reasons that follow, defendant's motion is GRANTED.

##### 1.   Applicability of the "On-sale" Bar

Patents are presumed valid once awarded.  35 U.S.C. § 282(a).  In an action for patent infringement, however, the defendant may argue that the patent itself is invalid, regardless of whether it asserts non-infringement of the patent's claims.  35 U.S.C. § 282(b).  To do so, a defendant carries the heavy burden of proving the patent's invalidity by

clear and convincing evidence, *Microsoft Corp. v. I4I Ltd.*
*P'ship*, 564 U.S. 91, 111 (2011), meaning evidence that instills
in the court an "abiding conviction" that the patent's
invalidity is highly probable.  *ActiveVideo Networks, Inc. v.*
*Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1327 (Fed. Cir. 2012).

      Generally, a defendant may prove a patent is invalid
by showing that it is anticipated by a single prior art
reference; or would have been obvious to a person of ordinary
skill in the art at the time of the invention.  *See* 35 U.S.C. §§
102, 103.  A patent will also be invalid if, more than a year
before the patent application was filed, the invention was both
ready for patenting and the subject of a commercial offer for
sale.  *Endo Pharm. Inc. v. Amneal Pharm., LLC*, No. 12 CIV. 8060
(TPG), 2015 WL 9459823, at *37 (S.D.N.Y. Aug. 18, 2015), *amended*
*in part*, No. 12 CIV. 8060 (TPG), 2016 WL 1732751 (S.D.N.Y. Apr.
29, 2016) (citing *Pfaff v. Wells Elecs., Inc.*, 525 U.S. 55, 67
(1998)).  This invalidity defense is known as the "on-sale" bar.
35 U.S.C. § 102(b).[10]

---

[10]    The Patents-in-suit were filed before March 16, 2013.  As a result, the
version of section 102 that preceded the Leahy-Smith America Invents Act
("AIA") governs.  Pub. L. No. 112-29, 125 Stat. 284, 285-93 (2011); *see* AIA §
3(n)(1), 125 Stat. at 293 (applying the relevant AIA amendments only to
applications and patents containing a claim with an effective filing date
of March 16, 2013, or later); *see also Fleming v. Escort Inc.*, 774 F.3d 1371,
1374 n.1 (Fed. Cir. 2014).  The applicable version of section 102(b) bars
entitlement to a patent where:

The on-sale bar applies when two conditions are satisfied before the critical date, *i.e.* the relevant filing date of the patents at issue: (1) the claimed invention must be the subject of a commercial offer for sale; and (2) the invention must be ready for patenting. *Pfaff*, 525 U.S. at 67.[11] An invention is "ready for patenting" when, prior to the critical date, the invention is reduced to practice, or is depicted in drawings or described in writings of sufficient nature to enable a person of ordinary skill in the art to practice the invention. *Hamilton Beach Brands, Inc. v. Sunbeam Prod., Inc.*, 726 F.3d 1370, 1374-75 (Fed. Cir. 2013) (citation omitted). The on-sale bar is a question of law based on underlying factual findings. *See Grp. One, Ltd. v. Hallmark Cards, Inc.*, 254 F.3d 1041, 1045-46 (Fed. Cir. 2001); *see also Leader Tech., Inc. v. Facebook, Inc.*, 678 F.3d 1300, 1305 (Fed. Cir. 2012) ("Whether a patent is invalid for a public use or sale is a question of law, reviewed *de novo*, based on underlying

---

[T]he invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States . . . .

35 U.S.C. § 102(b).

[11]  An actual sale is not required for the activity to be an invalidating commercial offer for sale. *Atlanta Attachment Co. v. Leggett & Platt, Inc.*, 516 F.3d 1361, 1365 (Fed. Cir. 2008).

facts, reviewed for substantial evidence following a jury verdict.").

Based on the record before the court, the on-sale bar critical date for the Patents-in-suit is October 29, 2009, one year before the '619 Patent's filing date. Defendant has submitted clear, convincing, and undisputed evidence that the accused Woodway Legacy Treadmills were offered for sale prior to October 29, 2009. Plaintiffs do not dispute that the Speedboard 2/Curve was introduced to the public and offered for sale in March 2009 at the IHRSA tradeshow. (JSOF (Sp.) ¶ 17 ("[The Speedboard 2/Curve] was disclosed to the public by Woodway and Astilean and *offered for sale* on or about March 17, 2009.") (emphasis added).) The Speedboard 2/Curve displayed at the IHRSA show was one of the Woodway Legacy Treadmill models accused of infringing the Patents-in-suit. (Def.'s Mot. 16; Pls.' Opp. 9; *see also* Supp. Compl. ¶ 19; TAC ¶ 15.) Astilean also testified that Woodway began selling Legacy Treadmills beginning in the spring of 2009. (JSOF (WW) ¶ 44.)[12]

Accordingly, defendant has established by clear and convincing evidence that the Patents-in-suit are invalid under 35 U.S.C. ¶ 102(b). Unless plaintiffs can demonstrate that the

---

[12] Woodway asserts May 5, 2009 as the date of its first sale of Legacy Treadmills, based on its accounting registers. (ECF No. 272, Jelenchik Decl., Ex. H, 1.)

Patents-in-suit are entitled to an earlier priority date, and defeat the on-sale bar, defendant's motion for summary judgment will be granted and plaintiffs' patent infringement claim will be dismissed.

### 2. Priority and the Written Description Requirement

#### a. Legal Standard

The priority date of a patent is governed by 35 U.S.C. § 119(e)(1).[13] Section 119(e)(1) sets forth four requirements that must be met for a non-provisional patent application to claim priority to a provisional application filing date, and therefore, gain the benefit of that earlier date. Only one of the four requirements pertains here: "the specification of the *provisional* must 'contain a written description of the invention and the manner and process of making and using it, in such full, clear, concise, and exact terms,' 35 U.S.C. § 112 ¶ 1, to enable an ordinarily skilled artisan to practice the

---

[13] Section 119(e)(1) provides:

An application for patent filed under section 111(a) or section 363 of this title for an invention disclosed in the manner provided by the first paragraph of section 112 of this title in a provisional application filed under section 111(b) of this title, by an inventor or inventors named in the provisional application, shall have the same effect, as to such invention, as though filed on the date of the provisional application filed under section 111(b) of this title, if the application for patent filed under section 111(a) or section 363 of this title is filed not later than 12 months after the date on which the provisional application was filed and if it contains or is amended to contain a specific reference to the provisional application.

35 U.S.C. § 119(e)(1).

invention *claimed* in the *non-provisional* application." *Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*, 800 F.3d 1375, 1378 (Fed. Cir. 2015) (citation omitted) (emphasis in original).[14] Section 112, paragraph 1 embodies two separate requirements that an applicant must satisfy to establish priority: a written description requirement and an enablement requirement. *Ariad Pharm., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010) ("Since its inception, this court has consistently held that § 112, first paragraph, contains a written description requirement separate from enablement . . . .").[15]

"The purpose of the written description requirement is to ensure that the scope of the right to exclude, as set forth in the [patent] claims, does not overreach the scope of the inventor's contribution to the field of art as described in the patent specification." *AbbVie Deutschland GmbH & Co., KG v. Janssen Biotech, Inc.*, 759 F.3d 1285, 1299 (Fed. Cir. 2014) (citations, internal quotation marks, and brackets omitted).  To

---

[14]    For the reasons discussed in footnote 10, the pre-AIA text of 35 U.S.C. § 112 governs.

[15]    Defendant's motion briefly alludes to the enablement requirement of 35 U.S.C. § 112 ¶ 1 in a footnote.  (Def.'s Mot. 7 n.11.)  Though the court will not consider an argument confined solely to a footnote, *United States v. Restrepo*, 986 F.2d 1462, 1463 (2d Cir. 1993), it is unclear what evidence, if any, plaintiffs could proffer to show that the '265 Provisional would enable a POSITA to practice the invention claimed in the Patents-in-suit, given the findings in the Whelan Order. (*See* Whelan Order 21 ("The court precludes Whelan's opinion as to whether the '265 provisional enabled a POSITA to make the invention as claimed in the patents-in-suit . . . .").

satisfy the written description requirement, "the applicant must 'convey with reasonable clarity to those skilled in the art that, as of the filing date sought, he or she was in possession of the invention,' and demonstrate that by disclosure in the specification of the patent." *Carnegie Mellon Univ. v. Hoffmann–La Roche Inc.,* 541 F.3d 1115, 1122 (Fed. Cir. 2008) (quoting *Vas-Cath Inc. v. Mahurkar,* 935 F.2d 1555, 1563–64 (Fed. Cir. 1991)); *see also Tronzo v. Biomet, Inc.*, 156 F.3d 1154, 1158 (Fed. Cir. 1998) ("[D]isclosure in a parent application that merely renders the later-claimed invention obvious is not sufficient to meet the written description requirement; the disclosure must describe the claimed invention with all its limitations."). Moreover, the written description requirement is not subsumed by the possession inquiry. Thus, "a showing of 'possession' is ancillary to the *statutory* mandate" for an adequate description of the claimed invention. *Enzo Biochem, Inc. v. Gen-Probe Inc.*, 323 F.3d 956, 969–70 (Fed. Cir. 2002)(emphasis in original). In other words, "a showing of possession alone does not cure the lack of a written description in the specification, as required by the statute." (*Id.*)

To satisfy the written description requirement, "the specification must describe an invention understandable to [a] skilled artisan and show that the inventor actually invented the

invention claimed," *Ariad*, 598 F.3d at 1351, not a "mere wish or plan" for obtaining the claimed invention. *Regents of the Univ. of Cal. v. Eli Lilly & Co.,* 119 F.3d 1559, 1566 (Fed. Cir. 1997). Identity of description is not necessary. *See, e.g., Crown Operations Int'l, Ltd. v. Solutia Inc.,* 289 F.3d 1367, 1376 (Fed. Cir. 2002) ("[T]he disclosure as originally filed does not have to provide *in haec verba* support for the claimed subject matter at issue."). Identity of that which is described, however, is necessary. "What is claimed by the patent application must be the same as what is disclosed in the specification . . . ." *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.,* 535 U.S. 722 (2002); *accord Lockwood v. American Airlines, Inc.,* 107 F.3d 1565, 1572 (Fed. Cir. 1997).

The written description inquiry is a question of fact and a patent's compliance with the written description requirement necessarily varies depending on context. *Ariad*, 598 F.3d at 1351 (citations omitted). Nonetheless, compliance with written description requirement is amenable to summary judgment in cases where no reasonable fact finder could return a verdict for the non-moving party. *PowerOasis, Inc. v. T-Mobile USA, Inc.*, 522 F.3d 1299, 1307 (Fed. Cir. 2008). A plaintiff seeking entitlement to the priority date of a provisional application

bears the burden of satisfying the written description requirement.  *See id.* at 1303-04.

> b.   The '265 Provisional Does Not Satisfy the Written Description Requirement

The '265 Provisional did not convey with reasonable clarity that, as of November 2, 2009, plaintiffs were in possession of the curved, non-motorized treadmill invention claimed by the Patents-in-suit.

First, the evidence on record shows that the '265 Provisional did not disclose the essential claim limitations in the '619 Patent.  Claim 1 of the '619 Patent discloses four limitations: (1) "said parallel **slats attached to each other in a resilient fashion;**" (2) "**timing belt** having respective **timing belt pulleys** attached to said front and rear pulley rollers for said closed loop treadmill belt;" (3) "wherein **timing belt idlers** are used to configure said timing belt geometrically to fit within constraints of side contours of said treadmill;" and (4) "said timing belt will not permit drooping down of said lower taut portion of said closed loop treadmill belt because **all respective motion is synchronous.**"  (JSOF (WW) ¶ 17 (emphasis added).)  Plaintiffs' technical expert, James Whelan, flatly acknowledged in his deposition that the '265 Provisional did not disclose these claim limitations.  For example, when defendant's counsel asked Whelan to identify where "slats

attached to each other in a resilient fashion" was disclosed in the '265 Provisional, Whelan testified that the "structure is not disclosed . . . ." (JDTA2850:13-18.) The '265 Provisional is also both literally and visually silent as to the other elements: a timing belt, timing belt pulleys, timing belt idlers, and synchronous motion. (JSOF (WW) ¶ 28; *see* JDTA2850:19-2851:16 (Whelan Dep.).)

The '265 Provisional discloses, as a means for keeping the lower portion of the running belt taut and the upper portion concave, "[s]prings (not shown) exert spring urgency in opposite directions holding taut the length of the lower belt portion 26A in a dimension of approximately twenty-three inches denoted by arrow 30 and in the upper belt portion 26B weighing approximately forty pounds, denoted by arrow 30." ('265 Provisional; JDTA1857:21- JDTA1858:1 (Bostan Dep.) ("**Q**: So you identified that the springs referenced in the provisional patent application were a solution to maintain the curvature of the running belt? **A**: Correct.").) The '619 Patent, however, describes a timing belt, timing belt pulleys, timing belt idlers, and the concept of synchronous motion, elements missing from the '265 Provisional, (JDTA2850:19-2851:16 (Whelan Dep.)),[16]

---

[16] Whelan's testimony with respect to synchronous movement of the belts was more equivocal, but he nonetheless conceded that "the wording" for synchronous movement "is not in [the '265 Provisional]." (JDTA2851:12-16.)

*as an alternative* to the use of springs. (JSOF (WW) ¶ 33.) In their depositions, Astilean and Bostan also admitted that Figure 1 of the '265 Provisional, reflecting the Wooden Prototype, did not disclose a timing belt or associated components for synchronous motion. (*See* WW SOF ¶ 35.)[17]

The written description in the '265 Provisional is no less deficient with respect to the '016 Patent. Claim 1 of the '016 patent discloses: "wherein each said slat . . . conform[s] to a concave row of **upper support peripheral ball bearings** located at each peripheral side of said upper portion of said motor-less, leg-powered curved treadmill." (JSOF (WW) ¶ 19 (emphasis added).) Claim 1 of the '016 patent also claims "[a] motor-less, leg-powered curved treadmill comprising: . . . a **means for slackening** an upper concave portion while simultaneously keeping a lower portion of the belt taut,

---

[17] Astilean conceded that the concept of timing belts and synchronous movement were not disclosed in the '265 Provisional. (JDTA0327:2-4.) He also suggested that the '265 Provisional should not be construed as limiting the invention to the figure disclosed and described in the application, and that there were alternative methods of accomplishing the same function. (JDTA0327:4-17.) Asked why the alternative approaches were not disclosed in the '265 Provisional, Astilean said "we were in a rush to file it. . . . we said we will come in with the rest." (JDTA0327:18-22.)

Bostan's testimony also confirms that Figure 1 in the '265 Provisional does not reflect a timing belt component:

**Q.** Would you refer to the photograph in Exhibit 8, would you ever refer to that structure as a timing belt?
. . .
**A.** No, this is not a timing belt.

(JDTA1823:4-JDTA1824:9.)

preventing said lower portion from drooping down during rotation and exertion of walking or running force upon said upper concave portion of said closed loop treadmill belt." ('016 Patent, col. 6, lines 30-52 (emphasis added).)

As with the '619 Patent, the undisputed record establishes that the '265 Provisional did not disclose the pertinent claim limitations of the '016 Patent.[18] At his deposition, Whelan acknowledged that the '265 Provisional did not disclose upper support peripheral ball bearings. (JDTA2843:23-25 ("**Q.** Where, if anywhere, does the 2009 Astilean provisional patent application refer to one or more linear arrays of bearings? **A.** The provisional does not mention that structure. **Q.** Does the 2009 provisional patent application mention ball bearings at all? **A.** I don't believe so.").)

Whelan's testimony also indicates the '265 Provisional did not disclose a "means for slackening." Pursuant to the Claim Construction Order, "means for slackening" is "limited to only those structures specifically disclosed in the specification, namely, Figures 2, 3, and 4, which, as set forth in the specification, perform the claimed function of

---

[18] The '016 Patent also requires parallel "slats attached to each other in a resilient fashion." (JSOF (WW) ¶ 97.) As noted above, the '265 Provisional does not disclose this limitation.

maintaining the concave or curved surface of the upper portion of the treadmill belt while keeping the lower portion taut." (Claim Constr. Order 21.) Whelan admitted that Figures 2, 3, and 4 were not disclosed in the '265 Provisional. (JDTA 2840:13-2841:24.) Whelan further acknowledged that, whereas the '265 Provisional disclosed the use of springs to keep the lower belt portion taut and the upper belt portion concave, the '619 Patent disclosed a "timing belt," and the '016 Patent disclosed a "means for slackening" using three different structures. (JDTA2853:6-2855:20; *see also* '016 Patent, col. 2, lines 24-28 (support belt, Figure 2); *id.* col. 3, lines 29-33 (timing belt, Figure 3); *id.* col. 2, lines 34-37 (linear array of ball bearings, Figure 4).) Whelan then admitted the following in response to defendant's counsel:

> **Q.** But you will agree with me that the provisional patent application disclosed a different method than the methods outlined in the '619 and '016 patents?
>
> **A.** I'll agree they disclose the same methods of keeping the upper belt portion concave and lower belt portion taut, but *there are different structures* to do that. The method is keeping the lower belt portion taut and the upper belt portion in a slacken state.
>
> **Q.** So they solve the same problem but do it in a different way, is that fair?
>
> **A.** They solve the same problem *using different structures*, yes. The way is really the same; lower belt portion taut and upper belt portion concave.

(JDTA2856:9-2856:23 (emphasis added).)

It is well-established that means-plus-function limitations "represent[] a *quid pro quo* by permitting inventors to use a generic means expression for a claim limitation provided that the specification indicates what structure(s) constitute(s) the means." *Chicago Bd. Options Exchange, Inc. v. Int'l Securities Exchange, LLC*, 677 F.3d 1361, 1367 (2d Cir. 2012). Structures will only be deemed equivalent to those asserted in a means-plus-function claim limitation where the differences are "insubstantial," *i.e.*, "if the assertedly equivalent structure performs the claimed function substantially the same way to achieve substantially the same result as the corresponding structure described in the specification." *Easyweb Innov., LLC v. Twitter, Inc.*, No. 11-cv-4550, 2016 WL 1253674, at *14 (E.D.N.Y. Mar. 30, 2016) (quoting *Odetics, Inc. v. Storage Tech. Corp.*, 185 F.3d 1259, 1267 (Fed. Cir. 1999)). In addition, "means-plus-function claims are limited to the particular structures the specification describes as performing the recited function (and their statutory equivalents), even if a person of ordinary skill in the art would know what other structures could be employed to perform the function." *Id.* (collecting cases).

Whelan's testimony that the support belt, timing belt, and linear array of ball bearings disclosed in the '016 Patent

are "different structures" than the springs disclosed in the '265 Provisional, even if they "solve the same problem," merely confirms that the "means for slackening" limitation, as construed by the court, was not adequately described in the '265 Provisional. Astilean's deposition testimony further corroborates this conclusion. (JDTA:0318:5-15 ("**Q.** So again, maybe you can point me where in the provisional application the slackening mechanism can be found. **A.** . . . There is nothing in the provision[al]." **Q.** So there is nothing in the provisional about the slackening mechanism? **A.** No I don't think it was, no. . . . It was just in the patent application.").)

As the party seeking entitlement to priority, plaintiffs have not met their burden to show a genuine dispute of material fact exists whether a person of ordinary skill in the art would conclude, after reviewing the '265 Provisional, that plaintiffs were indeed in possession of the invention claimed by the Patents-in-suit. Absent entitlement to an earlier priority date, the Patents-in-suit are rendered invalid by the on-sale bar, 35 U.S.C. § 102(b). Defendant's motion for summary judgment with respect to plaintiffs' claim for patent infringement is GRANTED and the infringement claim is therefore dismissed.

### c.  Plaintiffs' Contentions are Unavailing

Plaintiffs assert a number of arguments against summary judgment in their opposition brief and Rule 56.1 statement, but for the reasons discussed below, each lacks merit and fails to save their infringement claim.

*First*, plaintiffs argue that the PTO implicitly granted the Patents-in-suit priority dating to November 2, 2009. According to plaintiffs, "the USPTO determin[ed] that the patents in suit properly rely upon the filing date of the '265 provisional application, under 35 U.S.C. § 119(e)." (Pls.' Opp. 9.)  As evidence, plaintiffs point to self-made assertions of priority in the '619 and '016 Patent applications.  (JSOF (WW) ¶¶ 3, 4, 9; Jelenchick Decl., Ex. M (file history of '619 Patent), 33, 48; Jelenchick Decl., Ex. N (file history of '016 Patent), 10, 32.)  In addition, plaintiffs refer the court to Astilean's information disclosure statements ("IDSs"), (ECF Nos. 280-3, 280-4, Supp. Vodopia Decl., Exs. PL33, PL34), which likewise claim priority to the '265 Provisional's filing date, and which also note the March 2009 disclosure of the Speedboard 2/Curve at the IHRSA tradeshow.  (Pls.' Opp. 19.)  Based on these disclosures to the PTO, plaintiffs leap to the conclusion that, since the '619 and '016 Patents were granted, the PTO *must*

*have also granted* the earlier priority date of the '265 Provisional.

The Federal Circuit has deemed "unsound" the proposition, asserted here by plaintiff, that "a patent is entitled to the benefit of the filing date of its provisional precursor," because the PTO does not examine provisional applications as a matter of course. *Dynamic Drinkware*, 800 F.3d at 1380. Absent an explicit finding by the PTO, no presumption of entitlement to priority attaches. *PowerOasis*, 522 F.3d at 1305. It follows that that courts routinely reject assertions that issuance of a patent connotes implicit acceptance of priority claims. *E.g.*, *Chizmar v. ACCO Brands Corp.*, No. 14-CV-2181 PKC, 2015 WL 2408818, at *6 (S.D.N.Y. May 8, 2015), *aff'd*, 636 F. App'x 803 (Fed. Cir. 2016); *Bone Care Int'l, LLC v. Pentech Pharm., Inc.,* 741 F. Supp. 2d 865, 873–74 (N.D. Ill. 2010) (rejecting patentees' argument that "the examiner implicitly 'accepted' their assertion regarding the priority date" by issuing the patent, in the absence of any explicit determination of priority in the patent's file history).

Here, plaintiffs' priority assertion is especially unsound. Plaintiffs have not, and apparently cannot, point the court to any specific language in the '619 or '016 Patent

43

applications or file histories, or any other kind of evidence, that suggests the PTO rendered a priority determination. (*See, e.g.*, Pls.' Resp. WW SOF ¶ 24 (plaintiffs "[d]isagree," without citation to any, much less admissible, evidence, in response to defendant's statement that the PTO made no priority determination with respect to the Patents-in-suit).)  Lacking such evidence, the court will not read any priority determination into the PTO's grant of the '619 and '016 Patents.

*Second*, plaintiffs repeatedly assert that because the Patents-in-suit enjoy the presumption of validity, defendant has not carried *its burden* to prove by clear and convincing evidence that plaintiffs are not entitled to priority and did not satisfy the written description requirement. (Pls.' Opp. 10, 19.)  It is settled law that the party challenging the validity of a patent has the burden to prove invalidity, and that the burden of persuasion to prove invalidity by clear and convincing evidence never shifts and remains with the accused infringer. *See PowerOasis*, 522 F.3d at 1305; *Tech. Lincensing Corp. v. Videotek, Inc.*, 545 F.3d 1316, 1329 (Fed. Cir. 2008).  But once an accused infringer "has established a *prima facie* case of invalidity and its burden is met," the patentee bears the burden of coming forward with evidence to prove entitlement to claim priority to an earlier filing date.  *PowerOasis*, 522 F.3d at

44

1305-06.  Defendant has established a *prima facie* case of invalidity pursuant to the on-sale bar, 35 U.S.C. § 102(b). Plaintiffs attempt to satisfy their burden to produce evidence to the contrary, by asserting that the Patents-in-suit are entitled to claim priority based on the filing date of the '265 Provisional, and relatedly, that the '265 Provisional adequately discloses the limitations and specifications of the Patents-in-suit.

Leaving aside the irrefutable evidence that the '265 Provisional did not adequately describe the inventions claimed by the Patents-in-suit, given plaintiffs' burden of production, their failure to proffer adequate and admissible material evidence warrants summary judgment.  Plaintiffs' "evidence" is comprised almost exclusively on attorney *ipse dixit* and conclusory arguments.  As but one example, plaintiffs respond to defendant's contention that the '265 Provisional does not disclose "slats attached to each other in a resilient fashion," "upper support peripheral ball bearings," and a "means for slackening," (*see* Def.'s Mot. 12-15), as follows:

> This is not true-there clearly is support for the slats, the slats as resiliently attached and the means for slackening in the form of the timing belt and idlers required by claim 1 of the '619 patent and the means for slackening and upper support peripheral bearings as called out by claim 1 of the '016 patent.

(Pls.' Mot. 20.)  No citation to admissible evidence supports plaintiffs' contention.

Plaintiffs also cite ubiquitously to Astilean's own declaration.  (ECF No. 280-5, Declaration of Aurel A. Astilean in Opposition ("Astilean Opp. Decl.").)  Relying on this declaration, plaintiffs claim to have raised factual issues about whether the '265 Provisional discloses the elements pertinent to the Patents-in-suit.  For example:

> Plaintiffs acknowledge that the '265 provisional application does not expressly show "**upper support peripheral bearings**" but respectfully assert that the upper support peripheral bearings are inherent as hidden beneath the running belt in Fig. 1, as known to a POSA, or the wooden prototype could not operate. For that matter, there is no evidence (only allegations) that can be relied upon to hold otherwise. This is clear not only from Mr. Astilean's Declaration of July 12, 2019 . . ., but also from other evidence of record.

(Pls.' Mot. 22 (emphasis in original).)  Neither plaintiffs' opposition nor Astilean's declaration cites to admissible evidence for this contention.[19]  For that matter, Astilean's declaration cites no evidence whatsoever, and as defendant correctly notes, is mostly conclusory, and without basis in Astilean's personal knowledge.  (*See* Def.'s Reply 8-9.)

---

[19]    Ironically, plaintiffs effectively admit that the '265 Provisional does not disclose the upper support peripheral bearings element of the Patents-in-suit because they are "hidden."

Federal Rule of Civil Procedure 56(c) requires that affidavits submitted in connection with a summary judgment motion "be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c). "When an affidavit does not comply with these basic requirements, the offending portions should be disregarded by the court." *Wilson v. Sessoms-Newton*, No. 14-CV-0106 (PKC)(ST), 2017 WL 5508365, at *2 (E.D.N.Y. Nov. 15, 2017) (quoting *Wahad v. F.B.I.*, 179 F.R.D. 429, 435 (S.D.N.Y. 1998)). Astilean's opinions regarding the adequacy of the '265 Provisional are not admissible because plaintiffs have made no showing that Astilean is competent to testify on such matters. Plaintiffs have not disclosed Astilean as a POSITA or expert in their disclosures pursuant to Rule 26(a)(2) of the Federal Rules of Civil Procedure. (*See* ECF No. 271-28, Jelenchick Decl., Ex. BB (describing scope of Astilean's knowledge as: (i) the activities of Speedfit; (ii) the circumstances surrounding the breach of contract allegations; and (iii) other alleged wrongs Plaintiffs have suffered).) Astilean also admitted he was incapable of answering infringement-related questions at his deposition.[20]

---

[20] Astilean deferred to "the lawyers" when asked infringement-related questions at his deposition. (*E.g.*, JDTA0485:21- JDTA0487:5 ("**Q.** Mr.

*Third*, plaintiffs urge the court not to confine Claim 1 in the '016 and '619 Patents to the specific embodiment of the invention described and illustrated in the '265 Provisional. (Pls.' Opp. 23-26.)  Plaintiffs thus imply that the written description requirement is not as stringent as defendant suggests.[21]  Plaintiffs rely on *Phillips v. AWH Corp.*, an *en banc* decision of the Federal Circuit, which stated that "[a]lthough the specification often describes very specific embodiments of the invention, we have repeatedly warned against confining the claims to those embodiments."  415 F.3d 1303, 1326-27 (Fed. Cir. 2005).  The text quoted by plaintiffs has superficial appeal, but *Phillips* does not address the written description

---

Astilean, are there any curved treadmills that you allege infringe the claims of the '016 patent that don't infringe the claims of the '619 patent? . . . **A.** That's very complicated questions, and I don't think I'm capable to answer that.").)  To be clear, however, to the extent infringement is a legal issue, Astilean need not have offered testimony on that topic.

[21]     Plaintiffs claim the Federal Circuit does not require a written description to recite a known structure or any particular form of disclosure. (Pls.' Opp. 12.)  As a generic statement of law, this is not *per se* incorrect, but plaintiffs do not explain how that abstract legal principle applies to the specific facts on record.  Moreover, the cases plaintiffs cite for this proposition cabined their holdings to context-specific circumstances.  For example, in *Falko-Gunter Falkner v. Inglis*, which concerned the written description for a novel vaccine, the Federal Circuit held that an adequate written description of an invention that involves a biological macromolecule is not necessarily required to contain a recitation of known DNA structures. 448 F.3d 1357, 1366 (Fed. Cir. 2006).  Likewise, in *Carnegie Mellon Univ. v. Hoffman-La Roche Inc.*, the Federal Circuit acknowledged that a written description need not "utilize any particular form of disclosure to describe the subject matter claimed," but also clarified the need for "reasonable clarity" demonstrated by disclosure in the specification. 541 F.3d 1115, 1122 (Fed. Cir. 2008).  *Carnegie Mellon* concerned the adequacy of written descriptions in the context of biotechnological inventions.  *Id.*  In any event, plaintiffs neglect to explain how either *Inglis* or *Carnegie Mellon* excuses the '265 Provisional's failure to specify the claim limitations of the Patents-in-suit.

requirement.  The *Phillips* panel was primarily concerned with "danger of reading limitations from the specification," that is, the particular section of a patent that describes the invention, into the patent's claims.  *Id.* at 1323.  The panel explained that the purpose of the specification was to provide a POSITA with an example of the best mode to make and use the invention. *Id.*  Unlike a patent's specification, a provisional application is wholly extrinsic to the patent itself.  Indeed, defendant does not contend that Claim 1 of the Patents-in-suit ought to be limited to the specific embodiments set forth in their respective specifications.  Nor have the parties characterized the '265 Provisional as a "specification" with respect to the Patents-in-suit.  Rather, plaintiffs seek priority entitlement for the Patents-in-suit based on an entirely separate disclosure in a provisional application.  But nothing in *Phillips* suggests that the written description of an invention in a *provisional application* may be expanded, for purposes of entitlement to priority, to encompass limitations in a later-filed patent that were not reasonably conveyed in the provisional itself.

In a similar vein, plaintiffs assert that the written description in the '265 Provisional was adequate because any "missing" elements subsequently disclosed by the Patents-in-suit were "inherent" all along in the Provisional's description.

(Pls.' Opp. 14, 20-22.) "Under the doctrine of inherent disclosure, when a specification describes an invention that has certain undisclosed yet inherent properties, that specification serves as adequate written description to support a subsequent patent application that explicitly recites the invention's inherent properties." *Yeda Research & Dev. Co. v. Abbott GMBH & Co. KG*, 837 F.3d 1341, 1345 (Fed. Cir. 2016). Plaintiffs suggest the only claimed element not expressly disclosed by the written description in the '265 Provisional is the "upper support peripheral ball bearings," but that this "hidden" element is inherent because any "like device" must have bearings for the belt to slide upon. (Pls.' Opp. 14.) Disregarding, for the moment, plaintiffs' inaccurate contention that "upper support peripheral ball bearings" is the only element absent from the '265 Provisional's written description, an assertion belied by the record, "in order for [inherency] to be determined, one skilled in the art must examine the disclosure for evidence that the missing descriptive matter was present in the original application[]." *Realtime Data, LLC v. Morgan Stanley*, No. 11 CIV. 6696 KBF, 2012 WL 2434750, at *2 (S.D.N.Y. June 26, 2012) (citing *TurboCare Div. of Demag Delaval Turbomachinery Corp. v. Gen. Elec. Co.*, 264 F.3d 1111 (Fed. Cir. 2001)). Plaintiffs cite no evidence, much less the testimony or

affidavit of a POSITA, that the '265 Provisional's disclosure necessarily contained the missing descriptive matter.

Accordingly, the Patents-in-suit are not entitled to the earlier priority date of the '265 Provisional, and the on-sale bar renders the '619 and '016 Patents invalid. The lack of entitlement to an earlier priority date, coupled with the on-sale bar, requires denial of, and alternatively moots, plaintiffs' motion, which seeks summary judgment against defendant as to patent infringement. (*See* Pls.' Mot. 17-26.)[22]

## B.  Direct Infringement

---

[22]    Even so, the court would find that plaintiffs' motion fails to show no issue of triable fact that the Woodway Legacy Treadmills meet each claim limitation in Claim 1 of the Patents-in-suit. *See Lemelson v. United States,* 752 F.2d 1538, 1551 (Fed. Cir. 1985) ("It is . . . well settled that each element of a claim is material and essential, and that in order for a court to find infringement, the plaintiff must show the presence of every element . . . in the accused device."); *Laitram Corp. v. Rexnord, Inc.,* 939 F.2d 1533, 1535 (Fed. Cir. 1991) ("[T]he failure to meet a single limitation is sufficient to negate infringement of the claim . . . .").

In addition, in their infringement analysis, plaintiffs appear to have disregarded the court's construction of "means for slackening."  (*Compare* Pls.' Mot. 18 ("Speedfit construes the means for slackening of claim 1 of the '016 patent to mean *any* structure that prevents the upper portion of the closed loop treadmill belt from floating up between the end rollers, found in the patent and file history, and equivalents thereof, as understood by one of ordinary skill in the art.")(emphasis added), *with* Claim Constr. Order 17-18 (construing "means for slackening" term "as limited to the *structures specifically described* in the specification, *i.e.*, those disclosed in Figures 2, 3, and 4, and their equivalents.")(emphasis added).)  It is axiomatic that a patent infringement analysis requires "compar[ing] the allegedly infringing device against the claims *as construed* to determine whether the device embodies every limitation of the claims." *Nassau Precision Casting Co. v. Acushnet Co.*, 95 F. Supp. 3d 332, 347 (E.D.N.Y. 2015)(citations omitted)(emphasis added).  Plaintiffs' failure to apply the Claim Construction Order is a fatal defect in their patent infringement analysis.

The determination that the Patents-in-suit are invalid renders an infringement analysis moot.  Even assuming, *arguendo*, that the '016 and '619 Patents were valid, the court would still grant summary judgment and dismiss plaintiffs' infringement assertions based on the "doctrine of equivalents" theory.  (*See* Supp. Compl. ¶¶ 62, 66.)  The court would also grant summary judgment and dismiss plaintiffs' infringement claims related to the Woodway Current Treadmills.

### 1.  Doctrine of Equivalents

#### a.  <u>Legal Standard</u>

Even if an accused product does not literally infringe the asserted claims of a patent, the product may infringe under the doctrine of equivalents if the differences between the element of the accused product and the claim limitation at issue are insubstantial.  *Schoell v. Regal Marine Indus., Inc.*, 247 F.3d 1202, 1209–10 (Fed. Cir. 2001) (citing *Dawn Equip. Co. v. Kentucky Farms, Inc.*, 140 F.3d 1009, 1015–16 (Fed. Cir. 1998)).  "One test used to determine whether differences are insubstantial is to determine whether the element performs substantially the same function in substantially the same way to obtain substantially the same result as the claim limitation."  *Id.* (citation omitted).  The Supreme Court, however, has acknowledged that this particular "linguistic framework" may not

be appropriate in every case. *Warner-Jenkinson Co. v. Hilton Davis Chem. Co.,* 520 U.S. 17, 39-40 (1997). Rather, "[a]n analysis of the role played by each element in the context of the specific patent claim [must] inform the inquiry as to whether a substitute element matches the function, way, and result of the claimed element, or whether the substitute element plays a role substantially different from the claimed element." *Id.* at 40.[23]

The party alleging infringement bears the burden of proving equivalence at trial, and therefore, failure to set forth specific facts showing that there is a genuine issue for trial whether the accused product is insubstantially different from the claimed invention, merits a grant of summary judgment. *Schoell*, 247 F.3d at 1210. "The doctrine of equivalents is not a talisman that entitles a patentee to a jury trial on the basis of suspicion; it is a limited remedy available in special circumstances, the evidence for which is the responsibility of the proponent." *Id.* at 1210; *see also Zelinski v. Brunswick Corp.,* 185 F.3d 1311, 1317 (Fed. Cir. 1999) (affirming the

---

[23]    Other considerations may also be relevant in determining the range of equivalents to which the claimed invention is entitled, including "the prosecution history of the patent in suit, the pioneer status of the invention (or lack thereof), and the limitations on patentability of the allegedly equivalent device that would have been imposed by prior art extant at the time that the patent application was filed." *Monster Cable Prod., Inc. v. Quest Grp.*, No. C 04-0005 MHP, 2005 WL 1875466, at *8 (N.D. Cal. Aug. 8, 2005), *aff'd*, 210 F. App'x 993 (Fed. Cir. 2006) (collecting cases).

district court's grant of Brunswick's motion for summary judgment of noninfringement under the doctrine of equivalents because the only evidence submitted by patentee was a conclusory statement by a patent law expert).  Both the Supreme Court and Federal Circuit have "made clear that the evidence of equivalents must be from the perspective of someone skilled in the art, for example 'through the testimony of experts or others versed in the technology . . . .'"  *AquaTex Indus., Inc. v. Techniche Sols.*, 479 F.3d 1320, 1329 (Fed. Cir. 2007) (quoting *Graver Tank & Mfg. Co. v. Linde Air Prods. Co.*, 339 U.S. 605, 608 (1950)).

> b.  <u>Plaintiffs Have Not Proffered Evidence</u>
> <u>Regarding the Doctrine of Equivalents</u>

Plaintiffs have offered no expert testimony concerning infringement, much less infringement under a "doctrine of equivalents" theory.  (*See* WW SOF ¶ 67 ("Plaintiffs did not offer any expert testimony regarding infringement."); *see also* Pls.' Resp. WW SOF ¶ 67 ("Neither Plaintiffs nor Defendant offered testimony from a patent expert concerning infringement, as same is a fact issue.").)  Plaintiffs' technical expert, James Whelan, did not offer any opinions concerning infringement in his Report or Rebuttal,  (*see generally* Jelenchick Decl., Exs. K (Whelan Report) and L (Whelan Rebuttal)), as Whelan confirmed at his deposition.  (JDTA2790:5-7 ("**Q.** Did you offer

any opinions with respect to infringement in either of your expert reports? **A.** No."); JDTA2791:12-16 ("**Q.** So in your expert reports you didn't offer any opinion on whether any of WOODWAY's treadmill products infringed on any claim of the Astilean patents, did you? **A.** Correct.").)

Plaintiffs respond with conclusory language that "there is clear evidence of record" that the Woodway Legacy Treadmills "include[] each and every element [of] claim 1 of the '619 and '016 patents," and the Current Treadmills "include a means for slackening." (Pls.' Opp. 2.) Plaintiffs then cite to a litany of documents, (*id.* (citing, *inter alia*, Vodopia Decl., Exs. PL22, PL23, PL25-PL29), without the slightest explanation of how they are probative of infringement. In any event, a review of the documents cited does not yield any disputed, material factual issues with respect to infringement, and none constitutes evidence from the perspective of someone skilled in the art. Accordingly, plaintiffs' claim of infringement, to the extent based on a Doctrine of Equivalents theory, is dismissed, and defendant's motion for summary judgment in this respect is GRANTED.

### 2.    Woodway Current Treadmills

The record lacks evidence that the Woodway Current Treadmills infringe the Patents-in-Suit.  On March 2, 2017,

during discovery, Woodway produced computer aided design or "CAD" files of the production versions of the Current Treadmills. (JSOF (WW) ¶ 63; ECF No. 272-2 through -5, Jelenchick Decl., Exs. T (Current CURVE), U (Current ECOMILL), V (Current CURVE THREE 3.0), and W (CURVE Trainer).) The CAD files of the production versions of the Current Treadmills illustrate, at various stages, the specific components, sub-assemblies, and final assembly details of the Woodway Current Treadmills. (JSOF (WW) ¶ 64.)

Defendant contends that the Current Treadmills lack any of the claimed "means for slackening," as described in the '619 and '016 Patents and, therefore, as a matter of law, the court should dismiss plaintiffs' infringement claims as to the Woodway Current Treadmills. For example, although the CAD files for the Woodway Legacy Treadmills include an item described as "BELT, SYNC . . ." in the parts list, (*see* Jelenchick Decl., Exs. X (Legacy CURVE), Y (Legacy ECOMILL), and Z (CURVE THREE 3.0 Legacy)), the CAD files for the Current Treadmills do not refer to a synchronous mechanism, much less in relation to a belt or ball bearings. (Jelenchick Decl., Exs. T, U, V, and W.) Defendant also points out that the Current Treadmills do not have a timing belt stretching across the frame to connect the front and rear shafts of the treadmill through the use of timing

belt pulleys or timing belt idlers, and do not illustrate any support belt or linear ball bearings underneath the frame above or near the feet. (Def.'s Mot. 20-21.) Nicholas Oblamski also testified that Current Treadmills have "no methods of synchronization." (JDTA3001:18-23.)

Ultimately, the court need not wade into the merits of whether or not the Current Treadmills infringe because plaintiffs did not timely disclose or supplement their infringement contentions with respect to the Current Treadmills. Plaintiffs served their Disclosure Pursuant to Local Patent Rule 6 on August 4, 2014, which was directed to the Woodway Legacy Treadmills being offered at the time. (JSOF (WW) ¶ 58; ECF No. 271-18, Jelenchick Decl., Ex. R.) Plaintiffs' operative infringement allegations in the Supplemental Complaint are directed to the same "Curve Products." (JSOF (WW) ¶ 59; Suppl. Compl. ¶ 62.) Beginning in February 2016, however, Woodway began phasing out its Legacy Treadmills and introduced its Current Treadmills, which include a new CURVE, ECOMILL, CURVE THREE 3.0, and CURVE Trainer treadmill. (JSOF (WW) ¶ 61.) The court gave plaintiffs leave to take further discovery on the Current Treadmills. (ECF No. 154, Am. Sched. Order, ¶¶ 4, 6-7.) Plaintiffs sought and obtained written discovery and took three depositions about the Woodway's newer line of treadmills. (JSOF

(WW) ¶ 60; Jelenchick Decl., Ex. S; JDTA2887; JDTA2982;
JDTA3062.)  The court imposed a March 24, 2017 deadline for
plaintiffs to serve revised Local Patent Rule 6 Disclosures,
(Am. Sched. Order), which provided plaintiffs the opportunity to
apprise defendant and the court of plaintiffs' infringement
contentions and theories concerning the Current Treadmills.
*Two-and-a-half years later*, plaintiffs still have not done so.[24]
(WW SOF ¶ 62.)

        In *Nationwide Sales & Servs. Inc. v. Envirocare Techs.
Int'l, Ltd.*, a patent infringement case where plaintiffs'
counsel had inexplicably failed to submit claim charts setting
forth their infringement contentions under Local Patent Rule 6,
Magistrate Judge Brown granted summary judgment and dismissed
plaintiffs' infringement claims.  No. CV 16-6617 (GRB), 2018 WL
2436969, at *6 (E.D.N.Y. May 30, 2018), *aff'd sub
nom. Nationwide Sales & Servs. Inc. v. Steel City Vacuum Co.*,
771 F. App'x 490 (Fed. Cir. 2019).[25]  Judge Brown likened
plaintiffs' lapse to "a failure to prosecute."  *Id.*  Here,
plaintiffs failure to serve revised Local Patent Rule 6
disclosures setting forth their infringement claims with respect

---

[24]    Plaintiffs do not dispute the fact of their delinquency.  (Pls.' Resp.
WW SOF ¶ 62.)  Plaintiffs instead attempt to assert that the claim charts
embedded within their motion papers are functionally equivalent to Local
Patent Rule 6 disclosures.  (*Id.*)  The court respectfully disagrees and, even
if plaintiffs were correct, plaintiffs' tardiness is inexcusable.

[25]    The parties in *Nationwide* consented to jurisdiction by Judge Brown.

to the Current Treadmills likewise constitutes a failure to disclose and prosecute. At this stage of the litigation, it would be highly prejudicial to defendant if it were forced to learn of, and defend, plaintiffs' infringement theories for the first time at the summary judgment stage. Defendant's motion for summary judgment is thus GRANTED, and plaintiffs' infringement claim with respect to the Current Treadmills is therefore dismissed.

## II. State Law Claims

### A. Breach of Contract

"Under New York law, a breach of contract claim requires proof of (1) an agreement, (2) adequate performance by the plaintiff, (3) breach by the defendant, and (4) damages." *Prof'l Merch. Advance Capital, LLC v. C Care Servs., LLC*, No. 13-CV-6562 RJS, 2015 WL 4392081, at *4 (S.D.N.Y. July 15, 2015) (quoting *Fischer & Mandell, LLP v. Citibank, N.A.,* 632 F.3d 793, 799 (2d Cir. 2011)).

The Supplemental Complaint alleges that Woodway breached two written agreements from May 2003 and May 2005, by, among other things, selling the Woodway Legacy Treadmills and seeking patent protection for the same. (Supp. Compl. ¶¶ 68, 70.) The alleged May 2003 agreement is a purported non-disclosure agreement between Astilean and Bayerlein, however, it

is not clear what the parties agreed to keep confidential or what any of the other terms of the agreement were. (*Id.* ¶ 25.) The alleged May 2005 agreement included terms that were also "orally conveyed" to plaintiffs. (*Id.* ¶ 27.) The purported terms of the second agreement provided that the NDA was applicable to "all disclosures made by Speedfit and all actions taken by Woodway as a result of said disclosures, including, without limitation, the construction of prototypes of personal exercise equipment based on Speedfit's design." (*Id.*) The agreement is also alleged to have granted Speedfit "every right of every kind in and to its designs and any other information supplied by Woodway, and to any prototypes that Woodway builds as a result thereof . . . ." (*Id.*) Neither the Supplemental Complaint nor the record before the court provides further detail or evidence regarding other contractual provisions, such as when the alleged contract terminated, limitations to the scope of confidentiality, or remedies for breach.

In discovery, defendant requested "[a]ll agreements and all documents relating to any such agreements between Plaintiffs and Defendant." (ECF No. 271-29, Jelenchick Decl., Ex. CC, 5.) Defendant also propounded an interrogatory requesting plaintiffs "[i]dentify with particularity and provide a copy of each contract Plaintiffs contend Defendant[] breached,

specifying for each contract, the parties thereto, the date of formation, the subject matter, and all material terms."  (ECF No. 271-30, Jelenchick Decl., Ex. DD, at 7.)  At the time, plaintiffs claimed that copies of the NDAs "were previously provided to Defendant[] and contain all material terms therein." (ECF No. 271-31, Jelenchick Decl., Ex. EE, 12-13.)  Eventually, citing "plaintiffs' continued failure to produce the nondisclosure agreements," defendant sought and obtained the court's leave to move for default judgment on plaintiffs' breach of contract claim.  (ECF No. 76, ¶ 1(e).)  Before defendant filed its motion, however, plaintiffs filed the Supplemental Complaint.

With the purported written NDAs still missing from the record, (*see* Def.'s Mot. 22-24), plaintiffs now acknowledge that "there is no NDA in evidence," and accordingly, the purported NDAs may no longer serve as the basis of plaintiffs' breach of contract claim.  (Pls.' Opp. 2-3.)  Though neither the plaintiffs' opposition to summary judgment nor the Supplemental Complaint is a model of clarity, plaintiffs recently clarified on the record at oral argument that they have abandoned and

waived their breach of contract claim.  (Dec. 20, 2019 Hr'g Tr. 50:13-14.)[26]

Leaving aside plaintiffs' abandonment and waiver of their breach of contract claim, even if the court construed plaintiffs' allegations as relating to an oral agreement, plaintiffs have failed to show mutual assent to be bound or definite terms.  "Under New York law, a binding contract can be formed without the execution of a written agreement." *Rapay v. Chernov*, No. 16CV4910(DLC), 2017 WL 892372, at *3 (S.D.N.Y. Mar. 6, 2017) (quoting *Delaney v. Bank of Am. Corp.*, 766 F.3d 163, 171 (2d Cir. 2014)).  Still, "the plaintiff must demonstrate that the terms of any agreement are definite." *Id.*; *Express Indus. & Terminal Corp. v. New York State Dep't of Transp.*, 93 N.Y.2d 584, 589, 715 N.E.2d 1050, 1053 (1999) ("To create a binding contract, there must be a manifestation of mutual assent sufficiently definite to assure that the parties are truly in agreement with respect to all material terms."); *see also Joseph Martin, Jr., Delicatessen, Inc. v. Schumacher*, 52 N.Y.2d 105, 109 (1981) ("[B]efore the power of law can be invoked to enforce

---

[26]    Plaintiffs assert that they pled an alternative claim for unjust enrichment, which is now "ripe," in the event the alleged NDAs were not produced.  (Pls.' Opp. 3; *see also* WW SOF ¶ 83 ("Woodway did not agree to the terms of the alleged 2003 or 2005 "non-disclosure agreements" referenced in ¶¶ 25 and 27 of the Supplemental Complaint, orally or otherwise."); Pls.' Resp. WW SOF ¶ 83 ("Nondisclosure agreement(s) are not in evidence and not part of this case. The *absence of these contracts* is precisely why the unjust enrichment claim is ripe for adjudication.")(emphasis added).)

a promise, it must be sufficiently certain and specific so that what was promised can be ascertained."). "Even if the parties believe that they are bound, if the terms of the agreement are so vague and indefinite that there is no basis or standard for deciding whether the agreement had been kept or broken, or to fashion a remedy, and no means by which such terms may be made certain, then there is no enforceable contract." *Foros Advisors LLC v. Digital Globe, Inc.*, 333 F. Supp. 3d 354, 360 (S.D.N.Y. 2018) (quoting *Candid Prods., Inc. v. Int'l Skating Union*, 530 F. Supp. 1330, 1333 (S.D.N.Y. 1982)). "Whether the essential terms of a contract are too indefinite is generally an issue of law, properly determined on a motion for summary judgment." *Scarpinato v. 1770 Inn, LLC*, No. 13-CV-0955 JS SIL, 2015 WL 4751656, at *3 (E.D.N.Y. Aug. 11, 2015) (citations omitted).

Plaintiffs have not offered any evidence that there was a meeting of the minds on the terms of any oral agreement. (*See* WW SOF ¶¶ 80-84.)[27] At the very least, this void in the record generates "substantial ambiguity regarding whether both parties have mutually assented to all material terms," and

---

[27]    Defendant's SOF notes the lack of specifics regarding the alleged oral confidentiality agreement, represents that Woodway lacks information regarding the agreement's execution and its terms, and states that Woodway did not sign or otherwise agree to the NDAs referenced in the Supplemental Complaint. (WW SOF ¶ 7, 80-84.)  Plaintiffs note their disagreement with defendant's statements, but do not cite any evidence regarding the existence of the disputed agreement other than Astilean's vague testimony. (Pls.' Resp. WW SOF ¶¶ 80-84.)

precludes enforcement of the alleged oral agreement. *Scarpinato*, 2015 WL 4751656, at *3 (citations omitted). There is also a dearth of evidence about the specific terms of the oral agreement. Astilean's recollection was that the NDA required Astilean and Woodway to "[d]isclose everything between the parties." (JDTA0180:2-5.)[28] Astilean's testimony later in the deposition added little clarity. He testified that he had a "shake-hand deal" with Bayerlein, whereby Bayerlein was "supposed to create a prototype apparatus way to sustain country for the – for an exercise video to be placed in the shooting set for a video with Jessica Simpson." (JDTA0646:10-15.)[29]

Though Astilean and Bayerlein appear to have discussed the topics of a treadmill prototype, based on the record before it, the court has no means of construing an enforceable contract with definite terms. *See Schumacher*, 417 N.E.2d at 544.

---

[28]    Presumably, Astilean meant to suggest that the parties were required to share information and not disclose the shared information to outside parties.

[29]    Astilean also claimed he had other hand shake agreements with Bayerlein, though it is unclear whether these are the same oral agreement alleged in the Supplemental Complaint:

> I have shake-hands with Mr. Bayerlein would never leave the company a treadmill without the Speedfit name on it, the curved one. I had a shakes-hand with Mr. Bayerlein at the thousand treadmills sold, that slot, that tread slot will be named Speedfit not Woodway anymore. I had – one more. I had the shake-hands with Mr. Bayerlein he will eventually build a Speedmobile if one of the products I brought to him would become successful.

(JDTA0647:6-15.)

Consequently, the breach of contract claim is not viable and defendant's motion for summary judgment on this claim is GRANTED.

## B.   Unjust Enrichment

Plaintiffs allege in the Supplemental Complaint that "[d]efendant has been unjustly enriched through the receipt of proceeds of the sale of the Curve . . . ."  (Supp. Compl. ¶ 73.) Under New York law, a claim for unjust enrichment requires a plaintiff to establish: (1) that the defendant benefitted; (2) at the plaintiff's expense; and, (3) that equity and good conscience require restitution.  *Bank of Am., N.A. v. NMR Realty Abstract Servs., Ltd.*, No. 12-CV-797 JMA, 2014 WL 3585716, at *5 (E.D.N.Y. Jan. 2, 2014) (citing *Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of New Jersey, Inc.*, 448 F.3d 573 (2d Cir. 2006)).  The essence of an unjust enrichment claim is that "one party has received money or a benefit at the expense of another."  *Kaye v. Grossman*, 202 F.3d 611, 616 (2d Cir. 2000) (quoting *City of Syracuse v. R.A.C. Holding, Inc.*, 685 N.Y.S. 2d 381 (N.Y. App. Div. 4th Dep't 1999)).

### 1.   Defendant's Motion

Defendant's motion seeks to dismiss the plaintiffs' unjust enrichment claim on Statute of Frauds grounds.  The Statute of Frauds provides that an agreement will not be

recognized or enforceable if it is not in writing and "when the agreement by its terms is not to be performed within one year from the making thereof[.]" *Cron v. Hargro Fabrics, Inc.*, 91 N.Y.2d 362, 366, 694 N.E.2d 56 (1998) (citing N.Y. Gen. Oblig. Law § 5-701(a)(1)). New York courts interpret the Statute of Frauds narrowly. *Optionality Consulting Pte. Ltd. v. Nekos*, No. 18-CV-5393 (ALC), 2019 WL 4523469, at *7 (S.D.N.Y. Sept. 18, 2019). Accordingly, New York courts have limited the reach of the one year performance requirement of the Statute of Frauds to "those contracts which, by their terms, 'have absolutely no possibility in fact and law of full performance within one year.'" *Id.* (citation omitted). If an agreement may be "fairly and reasonably interpreted" as susceptible to performance inside of one year, the Statute of Frauds will not bar the enforceability of the agreement, no matter how "unexpected, unlikely, or even improbable that such performance will occur during that time frame." *Id.*; *Camp Summit of Summitville, Inc. v. Visinski*, No. 06-CV-4994 CM GAY, 2007 WL 1152894, at *5 (S.D.N.Y. Apr. 16, 2007) ("The question is not what the probable, or expected, or actual performance of the contract was; but whether the contract, according to the reasonable interpretation of its terms, required that it should not be performed within the year.") (citations and internal quotation marks omitted). "Where an oral agreement between the parties

calls for performance of an indefinite duration and may only be terminated within one year by a party's breach, the contract falls within the Statute of Frauds and is void." *Id.* (citation omitted).

Where the Statute of Frauds precludes enforcement of an oral agreement, "[a] party may not circumvent the Statute of Frauds by repleading an already barred breach of contract claim as a claim for unjust enrichment." *Almeciga v. Ctr. for Investigative Reporting*, 185 F. Supp. 3d 401, 412-13 (S.D.N.Y. 2016) (quoting *Four Star Capital Corp. v. Nynex Corp.*, 183 F.R.D. 91, 108 (S.D.N.Y. 1997)); *see also Almazan v. Almazan*, 2015 WL 500176, at *13 (S.D.N.Y. Feb. 4, 2015) ("[P]laintiffs may not pursue unjust enrichment claims if such claims are based on an oral agreement that is barred by the Statute of Frauds.") (internal quotation marks omitted); *KJ Roberts & Co. v. MDC Partners Inc.*, 2014 WL 1013828, at *12 (S.D.N.Y. Mar. 14, 2014) ("[T]he Statute of Frauds applies to the Alleged Agreement; therefore, Plaintiff cannot use a theory of quantum meruit or unjust enrichment to escape it."), *aff'd*, 605 Fed. Appx. 6 (2d Cir. 2015). Otherwise, plaintiffs could easily circumvent the Statute of Frauds. *Almeciga*, 185 F. Supp. 3d at 413.

Defendant's argument posits that because the written NDAs do not exist, plaintiffs' breach of contract action must be

based on the oral agreement referenced in the Supplemental
Complaint. (Def.'s Mot. 29.) Defendant further contends that
because the oral agreement between Astilean and defendant sets
forth legal obligations that cannot possibly be performed with
one year, it runs afoul of New York's Statute of Frauds, *see*
N.Y. Gen. Oblig. Law § 5-701, and therefore, so does plaintiffs'
duplicative unjust enrichment claim. (Def.'s Mot. 27-29.) As
discussed above, however, plaintiffs' breach of contract claim
was abandoned and waived, and also fails because there is
insufficient evidence that the parties entered into a contract
with definite terms. In short, there was no contract as an
initial matter for the Statute of Frauds to bar, and therefore,
the concern that plaintiffs' unjust enrichment claim may be used
to circumvent the Statute of Frauds' one year rule is
inapposite. The purpose of General Obligations Law § 5-
701(a)(1) is "to prevent fraud in the proving of certain legal
transactions particularly susceptible to deception, mistakes and
perjury." *Foster v. Kovner*, 44 A.D.3d 23, 26 (N.Y. App. Div.
1st Dep't 2007). But, whereas here, no legal transaction
occurred, allowing plaintiffs' unjust enrichment claim to
proceed does not frustrate the policy underlying the Statute of
Frauds' one year rule. *See Kovner*, 44 A.D.3d at 29 ("[I]nasmuch
as the breach of contract claims are not barred by the statute
of frauds, this rationale is inapplicable and the unjust

enrichment claim should be sustained as an alternative basis for relief in the event it is determined that there was no oral agreement . . . .") (citations omitted); *cf. Nakamura v. Fujii*, 253 A.D.2d 387, 390 (N.Y. App. Div. 1st Dep't 1998) ("[A]lthough the existence of a valid and enforceable contract generally precludes quasi-contractual recovery, where, as here, a bona fide dispute exists as to the existence of the contract, the plaintiff may proceed on both breach of contract and quasi-contract theories.").

Accordingly, given the lack of a contract claim, plaintiffs' unjust enrichment claim is not duplicative of a breach of contract claim, and does not circumvent the Statute or Frauds.  Defendant's motion for summary judgment as to plaintiffs' unjust enrichment claim is, therefore, DENIED.

### 2.   Plaintiffs' Motion

Plaintiffs also seek summary judgment against defendant on the unjust enrichment count.  (Pls.' Mot. 1, 12-17.)  Regrettably, plaintiffs' motion is a blunderbuss of conclusory remarks, purportedly factual statements that lack citation to evidence, and *ad hominem* attacks against defendant. Accordingly, the court must disregard the bulk of plaintiffs' motion.

Nonetheless, when distilled to statements reasonably susceptible to factual support, plaintiffs' theory appears to be as follows: Astilean and Speedfit disclosed the Wooden Prototype to Bayerlein in 2008; Bayerlein and his team at Woodway the relied on Astilean's input and know-how to develop the Speedboard 2; the Speedboard 2 ultimately became the Curve, one of the Woodway Legacy Treadmill models; the Curve and other Woodway Legacy Treadmills, which were developed, at least in part, using Astilean's contribution of time, technical knowledge, and effort, were sold in the market and resulted in profits for Woodway; Astilean and Speedfit, however, did not receive any portion of these profits.

Whether Woodway was enriched at plaintiffs' expense is a question of fact that turns principally on how much weight a jury assigns to Astilean and Speedfit's contribution to the Speedboard 2/Curve model that was introduced at IHRSA in 2009; whether that contribution, if any, benefitted defendant; and whether, and to what extent, it would be wrong for defendant to retain any benefit conferred by plaintiffs' contribution.

Based on the current record, the court cannot decide these factual issues regarding plaintiffs' unjust enrichment claim. The facts in the record establish that Astilean and Oblamski, Woodway's engineer, were in frequent contact beginning

in late 2008, leading up to the Speedboard 2/Curve's debut at the IHRSA tradeshow in March 2009. The record further establishes that Astilean, at various points, furnished plaintiffs with drawings, pictures, and videos about the Wooden Prototype, in addition to component parts, (Vodopia Decl., Exs. PL5, PL6), and answered Oblamski's questions about certain technical specifications for the treadmill. (*Id.*, Ex. PL8.) Oblamski used Astilean's input to generate computer models of treadmill prototypes on Woodway's internal system. (*Id.*, Ex. PL9.) A jury could find, based on this evidence, that Astilean made a substantial contribution to defendant's development of the Woodway Legacy Treadmills, and that equity entitles plaintiffs to some share of defendant's profits.

On the other hand, after Astilean's Wooden Prototype was featured on the Discovery Channel in January 2009, Oblamski asked Bayerlein and Weber whether Woodway would use Astilean's model for the IHRSA show, or "the one [Woodway] make[s]." (Vodopia Decl., Ex. PL10.) After Astilean sent Oblamski a design for a "new Speedboard" on January 21, 2009, Oblamski indicated the dimensions of the treadmill might have to be changed to avoid causing too much stress on the treadmill's structure. (*Id.*, Ex. PL11.) The next month, with the IHRSA show approaching, Oblamski told Astilean that he was building a

treadmill prototype with a long belt that "synchronizes the front and rear shafts," but planned to "make some adjustments." (*Id.*, Ex. PL12.)  Days after, Oblamski told Astilean that he "finally came up with a good solution" to keep the treadmill belt in position, and would continue to tinker with the prototype to improve its functionality.  (*Id.*, Ex. PL13.)  A jury reviewing this record could reasonably infer that Astilean's contribution to the Speedboard 2/Curve was negligible, that it was Oblamski's "solution" of keeping the treadmill belt in position that gave the treadmill its value and made it marketable, and therefore, equity does not require divesting Woodway of any portion of its profits for the Legacy Treadmills.

In sum, questions of fact preclude a finding of liability against defendant for unjust enrichment at the summary judgment stage.  Plaintiffs' motion for summary judgment as to their claim for unjust enrichment is therefore DENIED.  As a result, plaintiffs' motion for summary judgment with respect to damages for unjust enrichment is also DENIED without prejudice as premature.  (*See* Pls.' Mot. 14-17.)

### C.  Constructive Trust

Plaintiffs assert that Woodway's income from its sales of the Curve should be "segregated in a constructive trust in

Speedfit's name." (Supp. Compl. ¶ 7.) "Generally, a
constructive trust may be imposed when property has been
acquired in such circumstances that the holder of the legal
title may not in good conscience retain the beneficial
interest.'" *Sharp v. Kosmalski*, 40 N.Y.2d 119, 121, 351 N.E.2d
721, 723 (1976) (internal quotation marks and citations
omitted). The elements for imposition of a constructive trust
under New York law are: "(1) a confidential or fiduciary
relation, (2) a promise, (3) a transfer in reliance thereon and
(4) unjust enrichment." *Counihan v. Allstate Ins. Co.*, 194 F.3d
357, 361–62 (2d Cir. 1999) (quoting *Sharp*, 40 N.Y.2d at 121).
"Although these factors provide important guideposts, the
constructive trust doctrine is equitable in nature and should
not be 'rigidly limited.'" *In re Koreag, Controle et Revision
S.A. v. Refco F/X Assoc., Inc.* (*In re Koreag*), 961 F.2d 341, 352
(2d Cir. 1992) (citation omitted). However, in order for a
constructive trust claim to survive, plaintiffs must prove that
property is "held under circumstances that render unconscionable
and inequitable the continued holding of the property," and "the
remedy is essential to prevent unjust enrichment." *Counihan*,
194 F.3d at 362. "New York courts have clarified that '[a]s an
equitable remedy, a constructive trust should not be imposed
unless it is demonstrated that a legal remedy is
inadequate.'" *N. Shipping Funds I, LLC v. Icon Capital Corp.*,

921 F. Supp. 2d 94, 107 (S.D.N.Y. 2013) (quoting *In re First Cent. Fin. Corp.,* 377 F.3d 209, 215 (2d Cir. 2004)).

Here, defendant asserts that plaintiffs cannot establish that a confidential or fiduciary relationship existed between Astilean and Speedfit, on the one hand, and Woodway, on the other. (Def.'s Mot. 29-30.) Plaintiffs respond that "[t]he Implied Contract" establishes a sufficient relationship between the parties, and in the alternative, New York does not require all elements of a constructive trust claim to be met, so the lack of a confidential or fiduciary relationship would not doom plaintiffs' constructive trust claim. (Pls.' Opp. 8-9.)

Defendant's motion for summary judgment is GRANTED with respect to plaintiffs' constructive trust claim for the following reasons. "A confidential or fiduciary relationship exists between two persons or entities when one of them is under a duty to act for or to give advice for the benefit of the other upon matters within the scope of the relation." *Gargano v. Morey*, 165 A.D.3d 889, 890, 86 N.Y.S.3d 595, 598 (N.Y. App. Div. 2018) (citing *AG Capital Funding Partners, L.P. v. State St. Bank & Trust Co.*, 11 N.Y.3d 146, 158, 866 N.Y.S.2d 578, 896 N.E.2d 61 (N.Y. 2008)). "Such a relationship exists where confidence is reposed on one side, and there is resulting

superiority and influence on the other." *Id.* (citation omitted).

First, plaintiffs cannot premise a confidential or fiduciary relationship on an implied-in-fact contract alleged for the first time in their memorandum in opposition to summary judgment. *See Superior Site Work, Inc. v. NASDI, LLC*, No. 214CV01061ADSSIL, 2018 WL 3716891, at *22 (E.D.N.Y. Aug. 3, 2018) ("Even if the Court were to read the Plaintiffs' memorandum of law broadly to include a request to amend their complaint to include a breach of an oral contract, . . . [i]t is well settled that a party may not amend its pleadings in its briefing papers, including in a memorandum in opposition to summary judgment."); *see also Avillan v. Donahoe*, 483 F. App'x 637, 639 (2d Cir. 2012) (summary order) ("The district court did not err in disregarding allegations Avillan raised for the first time in response to Potter's summary judgment motion." (internal citation omitted)); *Shah v. Helen Hayes Hosp.*, 252 F. App'x 364, 366 (2d Cir. 2007) (summary order) (holding that "[a] party may not use his or her opposition to a dispositive motion as a means to amend the complaint" (internal citation omitted)). And even if the court allowed plaintiffs to allege an implied-in-fact contract for the first time in plaintiffs' opposition,

the court has already determined that no contract exists for the
reasons stated above.

Finally, though New York courts have warned against
applying the elements of a constructive trust too rigidly, they
have not jettisoned the requirements altogether.  Plaintiffs do
not establish a confidential or fiduciary relationship, and cite
no cases where a constructive trust claim survived a dispositive
motion despite a failure to demonstrate such relationship.  On
the contrary, a number of cases have dismissed constructive
claims for precisely that deficiency.  *McKenzie v. Fishko*, No.
12CV7297-LTS-KNF, 2015 WL 685927, at *10 (S.D.N.Y. Feb. 13,
2015) (granting defendants' motion for summary judgment and
dismissing constructive trust claim where there was "no evidence
that a fiduciary relationship existed between the parties.");
*FLB, LLC v. 5Linx*, 821 F. Supp. 2d 548, 560 (W.D.N.Y.
2011), *aff'd sub nom. FLB, LLC v. Cellco P'ship*, 536 F. App'x
132 (2d Cir. 2013) (granting summary judgment in favor of
defendant on constructive trust claim where plaintiffs failed to
raise triable issue of fact that fiduciary relationship existed
between plaintiffs and defendant); *see also Gargano v. Morey*,
165 A.D.3d 889, 891 (N.Y. App. Div. 2d Dep't 2018) ("There were
no allegations of a fiduciary relationship between the
plaintiffs and Monroe. Therefore, we agree with the Supreme

Court's determination to grant dismissal of the second cause of action, seeking the imposition of a constructive trust.") (motion to dismiss); *Lantau Holdings Ltd. v. Gen. Pac. Grp. Ltd.*, 163 A.D.3d 407, 410 (N.Y. App. Div. 1st Dep't 2018) ("Lantau's allegations in the complaint were insufficient to show that it had a confidential or fiduciary relationship with GPG, and therefore, the constructive trust claim was properly dismissed.") (motion to dismiss) (citations omitted).

As a result, plaintiffs' failure to establish that the requisite relationship existed with Woodway dooms their constructive trust claim and warrants summary judgment in defendant's favor. Though Astilean was clearly collaborating with Woodway throughout 2008 and 2009, nothing in the record indicates that either party was acting pursuant to any duty, *see Gargano*, 165 A.D.3d at 890, or that Astilean had anything more than an arms-length, commercial relationship with Woodway. The defendant's motion for summary judgment is GRANTED and the constructive trust claim in the Supplemental Complaint is therefore dismissed.

## CONCLUSION

For the reasons discussed above, defendant's motion is GRANTED with respect to plaintiffs' claims for patent infringement, breach of contract, and constructive trust. Counts

77

One, Two, and Four of the Supplemental Complaint are hereby DISMISSED WITH PREJUDICE. Defendant's motion for summary judgment is DENIED with respect to unjust enrichment. (Count Three). Plaintiffs' motion is DENIED in its entirety.

The parties are ordered to jointly confer and advise the court within five business days as to how they intend to proceed. If they intend to try this case rather than settle, the parties shall confer with respect to the Proposed Joint Pretrial Order, in light of the instant Memorandum & Order and the court's Memorandum & Order concerning defendant's motions *in limine*, which will follow shortly. The parties shall appear for a telephone status conference in three weeks.

**SO ORDERED.**

Dated: Brooklyn, New York
      January 9, 2020

                                                 /s/

**KIYO A. MATSUMOTO**
United States District Judge
Eastern District of New York